**3D ENTERPRISES CONTRACTING CORPORATION, Appellant,**

v.

**LOUISVILLE AND JEFFERSON COUNTY METROPOLITAN SEWER DISTRICT, Appellee.**

No. 2003–SC–0249–DG.

Supreme Court of Kentucky.

Aug. 25, 2005.

Rehearing Denied Nov. 23, 2005.

Michael J. O'Connell, Thomas E. Roma, Jr., Sarah J. Martin, Parker & O'Connell, PLLC, Louisville, Counsel for Appellant.

Laurence J. Zielke, John H. Dwyer, Jr., Pedley, Zielke & Gordinier, PLLC, Louisville, Counsel for Appellee.

Opinion of the Court by Justice JOHNSTONE.

This appeal arises from a judgment of the Jefferson Circuit Court granting summary judgment in favor of Appellant, 3D Enterprises Contracting Corporation; for claims arising from a construction project for Appellee, Louisville and Jefferson County Metropolitan Sewer District. The Court of Appeals reversed and remanded,

ordering the circuit court to enter summary judgment in favor of the Appellee. This Court granted discretionary review. For the reasons set forth herein, we reverse the judgment of the Court of Appeals and reinstate summary judgment in favor of the Appellant.

## Factual & Procedural Background

At the center of this matter is the construction of two bioroughing towers. These towers were designed to contain eleven layers of plastic bioroughing media, a material employed in the wastewater treatment process. In June of 1992, Louisville and Jefferson County Metropolitan Sewer District ("MSD") contracted with 3D Enterprises Contracting Corporation ("3D") to build the two bioroughing towers and an associated pumping station at MSD's main wastewater treatment plant in Louisville. Pursuant to the contract, 3D was to build these towers according to the plans and specifications prepared by Camp, Dresser, & McKee, Inc. ("CDM"), the consulting engineers on the project.

American Surfpac Corporation ("Surfpac") was chosen as the media supplier. Pursuant to the contract between 3D and MSD, 3D provided a general one-year warranty on the project. In addition, and also pursuant to the contract, 3D procured from Surfpac a manufacturer's warranty that extended four years beyond the one-year general warranty.

In May of 1994, CDM advised 3D that Surfpac was experiencing financial difficulties, and in fact was in the process of selling some of its assets. The parties consequently became concerned about Surfpac's ability to pay its own suppliers and its ability to honor the extended warranty on the media. At this time, 3D had paid Surfpac all sums due except $184,214.28 of its purchase order price for the media. 3D withheld this amount because of its concerns about the value of Surfpac's extended warranty.

When Surfpac did not receive payment, it filed a mechanic's lien against the funds due to 3D from MSD pursuant to KRS 376.210 *et seq.* 3D filed a protest. Also, in response to Surfpac's lien action, 3D filed a counterclaim against Surfpac, arguing that Surfpac would not be able to honor the extended warranty for the bioroughing media. 3D also filed a cross-claim against MSD and sought a declaration releasing itself from any obligation under the contract for the extended warranty. MSD did not file a counterclaim to 3D's cross-claim, but did withhold the lien amount from 3D.

On December 23, 1995, one of the bioroughing towers collapsed, destroying most of the media in that tower. MSD immediately began to investigate the collapse. As part of this investigation, it undertook discovery of Surfpac regarding its ability to honor its media warranty. By this time, Surfpac's financial picture was bleak: shortly after the collapse, Surfpac's attorneys admitted the company's insolvency.

In August of 1996, MSD filed suit against 3D and CDM to recover damages arising from the collapse. 3D filed a counterclaim seeking recovery of unpaid contract balances, including the $184,214.28 withheld as a result of the Surfpac lien. Meanwhile, because any recovery from Surfpac seemed unlikely, MSD entered into its own negotiations with the media supplier. Those negotiations culminated in a settlement agreement by which Surfpac surrendered all claims to any remaining contract funds, and MSD released Surfpac from any warranty claims.

Surfpac's lien litigation was still pending at this time; it had been continued indefinitely following the tower's collapse.

However, in July of 1997, the action was dismissed without prejudice for Surfpac's failure to prosecute. Purportedly in accordance with KRS 376.250(4), MSD continued to retain the $184,214.28 lien amount, pending court order or judgment. No court order was ever issued regarding the lien funds.

In light of the suit filed by MSD against 3D and CDM for damages resulting from the collapse, mediation was commenced. A settlement agreement was finally reached in April of 1999. As part of the agreement, 3D paid MSD an agreed sum for settlement of the breach of contract, breach of warranty, and negligence claims asserted by MSD in connection with the collapse. In exchange, MSD released any and all claims against 3D arising from the construction of the towers. The agreement did provide that 3D would retain its counterclaim against MSD for recovery of its contract balances. As a result, MSD's claims against 3D were dismissed *with prejudice* and 3D's counterclaim was dismissed *without prejudice.*

After the MSD action was dismissed, 3D began seeking recovery of its contract balances to no avail. An action was commenced in Jefferson Circuit Court; it is this action that is the basis of the present appeal. In its complaint, 3D sought to collect the balance it alleges MSD owed on the contract, including the $184,214.28 amount originally liened by Surfpac, which MSD continued to retain. A motion for partial summary judgment was filed by 3D as to the lien amount, asserting that it was entitled to payment of the $184,214.28 pursuant to KRS 376.210 *et seq.* MSD filed a cross-motion for summary judgment with respect to the same funds, arguing that it was entitled to retain the funds because 3D had breached its contract by failing to deliver a warranty with value. The trial court entered summary judgment in favor

of 3D as to the liened funds, concluding that MSD was obliged to pay the $184,214.28 to 3D because the lien had been released. KRS 376.210(3) provides that liens shall only attach to "any unpaid balance due the contractor for the improvement." According to the circuit court's reasoning, the lien represented monies otherwise due 3D; thus, when the lien was released, MSD should have complied with the statute and paid the $184,214.28 in liened funds directly to 3D. MSD appealed. 3D cross-appealed that portion of the trial court's judgment denying prejudgment interest.

The Court of Appeals reversed the trial court's summary judgment, determining that the trial court had erred in reviewing the claims solely pursuant to the lien statutes, without addressing MSD's cross-motion contract claims. The Court of Appeals focused on the following facts: 3D had withheld $184,214.28 from Surfpac, based on 3D's belief that Surfpac would be unable to honor its warranty. Although the lien was released, 3D was no longer entitled to these funds because it had breached its contract with MSD by delivering a worthless warranty on the media. The $184,214.28 represented the value of the warranty, and therefore MSD was permitted to withhold this payment from 3D as a result of its breach.

This Court granted discretionary review. Both parties make several arguments on appeal. 3D's primary assertion is that the lien statutes apply to this matter; that is, the failure of Surfpac to perfect the lien required MSD to release the funds to 3D. MSD argues that the lien action is of no consequence to the present matter, as it is nonetheless entitled to withhold the disputed funds because 3D failed to deliver a warranty on Surfpac's media per the original contract. 3D counters that the settlement agreement between itself and MSD

prevents MSD from claiming the funds due to breach of contract, as such claims were specifically waived. MSD argues that the settlement agreement did not waive the type of claim that is being pursued herein.

**Standard of Review**

■■■■ In ruling on a motion for summary judgment, the trial court must examine the record to determine if any real or genuine issue of material fact exists. *City of Florence v. Chipman*, 38 S.W.3d 387, 390 (Ky.2001). Summary judgment is proper when, as a matter of law, it appears that it would be impossible for the non-moving party to produce evidence at trial warranting a judgment in his favor. *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 483 (Ky.1991); CR 56.03. Because summary judgments involve no fact finding, this Court will review the circuit court's decision *de novo*. *Blevins v. Moran*, 12 S.W.3d 698, 700 (Ky.App.2000).

**The Lien Claim**

3D's primary argument is that it is entitled to the lien amount—$184,214.28—because Surfpac failed to timely perfect the lien, rendering it void. 3D makes two alternative arguments regarding why the lien has been released: (1) because the settlement agreement between Surfpac and MSD operated to release any lien claim, or (2) because the lien action was dismissed for failure to prosecute. The trial court below considered all three of these arguments and concluded that each operated to release the lien.

*Kentucky's Public Improvement Lien Statutes*

KRS 376.210 *et seq.* govern liens for labor, materials, or supplies furnished on public improvements. After a lien is filed, the public authority may withhold the lien amount. KRS 376.250(1). The contractor may file a written protest within thirty days; once the protest is filed, the public authority continues to withhold the funds, paying them to neither the contractor nor the lien claimant until the matter is resolved. KRS 376.250(3). Thereafter, the lien claimant may file suit. If suit is filed, the funds are released upon court order or judgment. KRS 376.250(4). However, limitations apply: the lien claimant must institute the suit *and* serve summons of the suit on the public authority within thirty days after written notice of the contractor's protest is mailed to the lien claimant. *Id.* (emphasis added). If these requirements are not satisfied within thirty days, the lien funds are to be "automatically released" and "promptly" paid to the contractor. KRS 376.250(4).

*Surfpac's Failure to Perfect the Lien*

■■■■ The record reveals that Surfpac failed to serve its complaint on MSD within the thirty-day time limit of KRS 376.250(4): service was required as of June 27, 1994, but did not occur until June 28, 1994. According to the statute, the lien should have been automatically released and the funds withheld should have been paid to 3D. MSD did not, however, pay the lien funds to 3D. The matter is complicated, though, by the fact that 3D did not raise this failure to the trial court, but proceeded with the action for three more years. Despite this failure, we conclude that the lien was automatically released upon Surfpac's failure to strictly comply with the statute's procedural requirements.

■■■■ In Kentucky, liens are created by statute, and therefore the operation, extent, and rights created by the lien must be determined by the language of the statute. "Kentucky adheres to the rule that the statutory provisions for perfecting a lien must be strictly followed." *Laferty v. Wickes Lumber Company*, 708 S.W.2d 107,

108 (Ky.App.1986) (construing mechanic's lien statutes). Moreover, this Court has specifically rejected arguments that the lien statutes should be liberally construed: "While it may be argued that the mechanic's lien statutes may be liberally construed, we recognize ... that the better rule is to require strict adherence to the statutory provisions for perfecting a lien." *Middletown Engineering Company v. Main Street Realty, Inc.*, 839 S.W.2d 274, 276–77 (Ky.1992) (construing mechanic's lien statutes). KRS 376.250(4) clearly and unequivocally states that a lien is "automatically released" if the procedural requirements are not met. In *Jim Skaggs, Inc. v. Smith*, 799 S.W.2d 585 (Ky.App. 1990), a general contractor filed its written protest two days after the KRS 376.250(2) deadline, though the matter proceeded nonetheless and the contractor was permitted to present defenses to summary judgment on the merits. The Court of Appeals determined that all of the contractor's defenses were precluded by its failure to strictly comply with the statute's time limitations. *See also In re Excel Engineering, Inc.*, 224 B.R. 582 (Bankr. W.D.Ky.1998) (subcontractor's failure to strictly comply with requirements of KRS 376.250 by filing complaint two days late was fatal to its claim that a valid lien existed). Therefore, as Surfpac failed to timely serve its complaint on MSD, the lien was automatically released as of June 28, 1994. The fact that the action proceeded does not operate to waive the requirement or somehow resurrect the lien. Thus, 3D was entitled to the $184,214.28 lien amount on June 28, 1994. Accordingly, we need not address 3D's additional arguments regarding the validity of the lien, as we have determined that the lien was released prior to both the settlement agreement and the dismissal of Surfpac's lien action.

**The Contract Claim**

MSD argues that it is entitled to retain the $184,214.28 in liened funds notwithstanding a determination that the lien had been released. According to MSD, once the lien was released, the funds would have been distributed except that the amount was no longer due under the contract. As explained above, 3D was required to procure an extended warranty from Surfpac on its media as part of its contract with MSD. Surfpac later dissolved, and the company's warranty lost all value. Due to Surfpac's insolvency, MSD modified the contract by Change Order No. 16, which adjusted the contract balance by deducting the cost of Surfpac's extended warranty. MSD thus reasons that, subsequent to the lien's release, the $184,214.28 was no longer due and owing 3D under the contract. Alternatively, MSD argues that, even if the contract had not been validly modified, 3D breached the original contract by delivering a worthless warranty from Surfpac. This breach would entitle MSD to withhold $184,214.28, representing the value of the warranty. 3D offers several arguments why MSD is not entitled to these funds: (1) MSD is barred from making this type of claim by its settlement agreement with 3D; (2) MSD waived this claim when it failed to file a counterclaim against 3D in the Surfpac lien action; and (3) the claim fails on the merits, as Surfpac's subsequent inability to honor its warranty does not constitute a breach by 3D.

We find 3D's assertion that the settlement agreement bars MSD's present claim to be determinative, and we address only that argument. Thus, for purposes of this holding, we assume the validity of MSD's contract claim *arguendo,* and we make no substantive determinations as to whether the ultimate worthlessness of the Surfpac warranty constituted a breach by 3D.

*The Purported Contract Modifications*

█ At the outset of this discussion, we must address MSD's claim that Change Order No. 16 modified the contract. According to MSD, once it was concluded that the Surfpac warranty was worthless, MSD executed a change order that validly modified the original contract by reducing from the total contract price the value of the Surfpac warranty. Change Order No. 16 reduced the contract price by $184,214.28 "as a result of the lien and subsequent failure of American Surfpac." *If* the contract had been validly modified to reduce the Surfpac warranty from the cost of the contract, then MSD would not have to rely on a breach of contract claim herein.

The record, however, reveals insufficient evidence that the contract was modified, other than MSD's bare assertions that a modification occurred. All copies of Change Order No. 16 included in the record are unsigned. They also are undated. Furthermore, even if properly executed, we cannot determine if the change order would operate as a valid modification pursuant to the terms of the original contract, as neither party has designated for the record a copy of pertinent portions of the original contract between 3D and MSD. In short, we have been provided with no evidence upon which to base a determination that a valid modification occurred. Therefore, we reject MSD's initial argument that the contract had been validly modified.

*The Settlement Agreement Between MSD and 3D*

After MSD sued 3D and CDM, amongst others, for damages resulting from the tower's collapse, all parties entered into negotiations, which resulted in the "Release, Covenant Not To Sue, and Global Settlement Agreement." An overview of relevant portions of the settlement agreement is worthwhile. MSD releases 3D (one of the "Settling Defendants") by Item # 2, which reads in pertinent part:

> MSD and Allendale hereby covenant not to sue and fully and finally release the Settling Defendants ... from any and all possible, potential, or actual claims, causes of actions, demands, or damages, both known and unknown, in contract or in tort, which MSD and Allendale may have against the Settling Defendants ... with regard to the facts and circumstances giving rise to the litigation known as *Louisville and Jefferson County Metropolitan Sewer District, et al. v. Camp, Dresser, McKee, et al.* (the "Lawsuit") .... MSD and Allendale further agree to dismiss, with prejudice, the entirety of their claims against the Settling Defendants asserted by them in the Lawsuit and to release forever the Settling Defendants ... from any liability of any kind, character, or description whatsoever which does or may result from any factual or legal assertion that arises or might arise from the Lawsuit.

Similar language was employed to likewise release MSD from any claims asserted by 3D. However, during the settlement agreements, 3D and MSD apparently realized that there were outstanding claims for contract sums, and these claims might relate to acceptable work performed. The following exception was included in Item # 3 of the agreement:

> however, that MSD and CDM and 3D agree that to the extent contract payments which may be due CDM and 3D for acceptable work performed are unpaid, these contract claims will be resolved in the normal course. MSD agrees that it will not assert as a basis for denying payment of contract claims by CDM and 3D any of the alleged deficiencies in the design, construction, or construction contract administration for which it sought damages in the Law-

suit, which matters are hereby resolved by accord and satisfaction.

3D argues that Item # 2 operates to bar MSD from now claiming that 3D breached its contract by delivering a Surfpac warranty that was ultimately rendered worthless. MSD asserts that the present claim falls under the exception provided for in Item # 3 of the agreement, *i.e.* contract claims relating to contract payments for "acceptable work performed."

*MSD Waived Its Present Claim in the Settlement Agreement*

 Once the settlement agreement had been reached, MSD's claims against CDM and 3D were dismissed *with prejudice* by agreed order pursuant to the terms of the agreement. 3D's counterclaims were dismissed *without prejudice.* MSD's present claim—that 3D breached by failing to deliver a warranty on Surfpac's media—will therefore be barred by the doctrine of *res judicata* if there is an identity of both parties and causes of action. The fact that this matter was settled rather than tried does not abrogate the effect of the doctrine: "[i]n general, a judgment by agreement, consent or compromise bars a subsequent action on the same cause of action." *Blevins v. Johnson,* 344 S.W.2d 375, 377 (Ky.1961). *See also Sharp v. Bannon,* 258 S.W.2d 713, 715 (Ky.1953). "Identity of the subject matter and the parties is not alone a sufficient test for a former judgment to be res judicata of a later action; the true requirement is that the causes of action in the two suits shall be the same." *Blevins,* 344 S.W.2d at 377. As there is undoubtedly identity of parties, the only issue, then, is whether MSD waived the present contract claim by the settlement agreement that resulted in dismissal with prejudice.

 "An agreement to settle legal claims is essentially a contract subject to the rules of contract interpretation." *Can-trell Supply, Inc. v. Liberty Mutual Insurance Co.,* 94 S.W.3d 381, 384 (Ky.App. 2002). The primary objective is to effectuate the intentions of the parties. *Id.* When no ambiguity exists in the contract, we look only as far as the four corners of the document to determine the parties' intentions. *Hoheimer v. Hoheimer,* 30 S.W.3d 176, 178 (Ky.2000). "The fact that one party may have intended different results, however, is insufficient to construe a contract at variance with its plain and unambiguous terms." *Cantrell,* 94 S.W.3d at 385. "Generally, the interpretation of a contract, including determining whether a contract is ambiguous, is a question of law for the courts and is subject to *de novo* review." *Id.*

We find the terms of the MSD/3D settlement agreement to be clear and unambiguous. By Item # 2, MSD waives "all possible, potential, or actual claims, causes of actions, demands, or damages, both known and unknown, in contract or in tort" against 3D. MSD's current breach of contract claim was an "actual" claim: in Count IV of its Second Amended Complaint, MSD alleged that 3D breached the construction contract. Again, in Count VI, MSD alleged that 3D had "numerous contractual warranty obligations to MSD" and that "all" had been breached. We are also persuaded by the fact that MSD waived all "possible" or "potential" claims against 3D. The issue of Surfpac's warranty was not even a "possible" or "potential" claim against 3D at the time of the settlement agreement—it was a *known* claim. Concerns about the value of the warranty arose as early as the lien action, over a year before the tower even collapsed. The language of this release is exceedingly broad, and the only logical reading of this contractual language is that MSD waived all claims against 3D, including the present claim.

Moreover, Item # 2 goes on to specifically release 3D from "any liability of any kind, character, or description whatsoever which does or may result *from any factual or legal assertion that arises or might arise from the Lawsuit*" (emphasis added). The subject of the lawsuit was the tower's collapse, potentially resulting from the internal collapse of the bioroughing media. A claim relating to the worthlessness of the warranty of this media would be an "assertion that arises or might arise from the Lawsuit." Thus, it is our conclusion that, by Item # 2 of the settlement agreement, MSD waived all claims against 3D, and is therefore barred from now claiming that 3D breached its contract by delivering a warranty on Surfpac's media that later lost all value.

*MSD's Present Claim Does Not Fall Within the Agreement's Exception*

 MSD argues that this present claim of breach is specifically "carved out" in the settlement agreement at Item # 3, which states: "to the extent contract payments which may be due CDM and 3D for acceptable work performed are unpaid, these contract claims will be resolved in the normal course." We are not persuaded that this language embodies MSD's present claim of breach. First, it simply defies reason that MSD would consider the Surfpac warranty "acceptable work performed" at the time of the settlement agreement; it had been disputing the warranty funds since the Surfpac lien action. In fact, the basis of its claim herein is that 3D failed to perform. Simply put, MSD cannot rely on a clause permitting claims for acceptable work performed in order to allege that the disputed work was unacceptable.

Second, the settlement agreement goes on to specifically delineate certain types of defenses that MSD waives as a basis for denying payment of contract claims, namely "alleged deficiencies in the design, construction, or construction contract administration for which it sought damages in the Lawsuit." A failure of a general contractor to procure a warranty from a subcontractor surely falls within the meaning of "construction contract administration." For these reasons, and in the absence of more specific language in the agreement reserving a claim relating to the Surfpac warranty, we do not believe that this clause preserves the present claim.

The argument has been propounded that our interpretation relies on an inherently inconsistent reading of the agreement. That is, if one reads Item # 2 as a complete waiver of MSD's claims while also acknowledging that Item # 3 retains certain contract claims for acceptable work performed, it would necessarily follow that MSD has ostensibly waived all of its defenses to contract claims falling under the exception. One could therefore conclude that such a reading was not the intention of the parties, as it is plainly against MSD's interest. This argument is illusory, however, as it exaggerates MSD's limitations in defending itself. While MSD is barred from asserting a complete breach theory, it would not be barred, for example, from disputing the value of the acceptable work performed. Still, MSD is admittedly constrained as to the types of defenses it may raise in the present matter by virtue of this settlement agreement. However, in light of the significant monetary consideration received, the broad and unambiguous language of the agreement, and the fact that MSD's claims were knowingly dismissed with prejudice while 3D's were dismissed without prejudice, we can only conclude that this limitation was bargained for.

**3D's Claim for Prejudgment Interest and Conclusion**

 In conclusion, as Surfpac failed to timely perfect its lien, the liened funds

should have been released automatically to 3D. MSD acted in violation of Kentucky's lien statutes by retaining the funds. MSD's present claim that it is entitled to retain the funds notwithstanding the released lien are barred by its settlement agreement with 3D, and the subsequent dismissal of its claim with prejudice. Because 3D's counterclaims were dismissed without prejudice, it is not barred from maintaining the present action for recovery of the liened funds. The Court of Appeals therefore erred in reversing and directing the trial court to enter summary judgment in favor of MSD.

■ Consequently, as 3D was entitled to summary judgment, we will consider its cross-appeal for prejudgment interest. The longstanding rule in this state is that prejudgment interest is awarded as a matter of right on a liquidated demand, and is a matter within the discretion of the trial court or jury on unliquidated demands. *Nucor Corp. v. General Electric Co.*, 812 S.W.2d 136, 141 (Ky.1991). 3D argues that the demand was liquidated, and therefore prejudgment interest should have been awarded. The trial court, here, denied prejudgment interest, reflecting its determination that the claim was unliquidated.

■ We agree with the trial court's classification of 3D's demands as unliquidated. Liquidated claims are "of such a nature that the amount is capable of ascertainment by mere computation, can be established with reasonable certainty, can be ascertained in accordance with fixed rules of evidence and known standards of value, or can be determined by reference to well-established market values." 22 Am.Jur.2d DAMAGES § 469 (2004). A careful look at the nature of the numerous claims and counterclaims asserted makes clear that the claims were unliquidated.

3D filed this action to recover several unpaid contract balances, including the $184,214.28 lien amount. In response, MSD did not simply deny liability for the lien amount under the terms of the contract. On the contrary, MSD rested its case primarily on a breach of contract theory: that 3D breached the contract by failing to procure the Surfpac warranty. The value of the warranty, however, was never fixed. No line item value was ever placed on Surfpac's warranty, nor does the contract contain a certain computation that could be used to readily ascertain the value of the warranty. In fact, even 3D argues that MSD is not entitled to summary judgment, in part, because the value of the warranty was subject to dispute. *Cf. Cooper v. Hubbard,* 703 S.W.2d 494, 497 (Ky.App.1986) (concluding that demand for unpaid commission was liquidated, where amount was defined by contract and defendant merely denied liability, without alleging any breach of contract). Therefore, the claim was unliquidated.

■ It must be remembered that, in determining if a claim is liquidated or unliquidated, one must look at the nature of the underlying *claim,* not the final award. That is, the fact that we have ultimately determined that 3D is entitled to the liened funds should not be construed as confirmation that the original claim was liquidated. One needs only consider an opposite result to illustrate this point: If we had concluded that MSD's counterclaims prevailed, as the Court of Appeals concluded, then the matter would necessarily be remanded to the trial court for determination of the value of the warranty, as it was never agreed upon by the parties.

For these reasons, we agree with the trial court that the demand was unliquidated. Furthermore, the trial court did not

abuse its discretion in denying prejudgment interest. *Nucor*, 812 S.W.2d at 145.

For the foregoing reasons, the opinion of the Court of Appeals is reversed and the judgment of the Jefferson Circuit Court is reinstated.

LAMBERT, C.J.; GRAVES, ROACH, and WINTERSHEIMER, JJ., concur.

SCOTT, J., concurs in part and dissents in part by separate opinion, with COOPER, J., joining.

SCOTT, Justice, Concurring in Part and Dissenting in Part.

I agree with the majority opinion except as to the prejudgment interest against which I must respectfully dissent.

The amount was undisputedly liquidated at the time of the filing of the lien. However, the majority now holds the known liened funds to be unliquidated as a result of the various claims and counter-claims asserted by the parties during the course of the litigation.

As the majority concedes, but then misses, the longstanding rule in Kentucky is that prejudgment interest is awarded as a matter of right on a liquidated demand, and is a matter within the discretion of the trial court or jury on unliquidated demands.[1] This Court, in *Nucor*, gave specific examples of liquidated amounts. These include "a bill or note past due, an amount due on an open account, or an unpaid fixed contract price."[2] "In general, 'liquidated' means made certain or fixed by agreement of the parties or by operation of law."[3]

The amount at issue here was due under the contract and had been fixed—even before the lien (which was invalidated) attached. "[T]he tendency of the courts is to charge and allow interest in accordance with the principles of equity, to accomplish justice in each particular case."[4]

It is evident that the amount at issue here was a liquidated, unpaid fixed contract amount which remained liquidated throughout. Any confusion resulting from the other claims and cross-claims did not render the amount unliquidated. 3D Enterprises should have been entitled to prejudgment interest on the liened amount.

COOPER, J., joins this opinion.

**1.** *Nucor Corp. v. General Electric Co.*, 812 S.W.2d 136, 141 (Ky.1991).

**2.** *Id.* at 141.

**3.** *Id.*

**4.** *Reliable Mechanical, Inc. v. Naylor Industrial Services, Inc.*, 125 S.W.3d 856, 858 (Ky. App.2003).