NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0183n.06

Case Nos. 18-5372/5388

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED

Apr 10, 2019
DEBORAH S. HUNT, Clerk

EQT PRODUCTION COMPANY,　　　　　 )
　　　　　　　　　　　　　　　　　　　 )
　　　Plaintiff-Appellant/Cross-Appellee,　 )
　　　　　　　　　　　　　　　　　　　 )　ON APPEAL FROM THE UNITED
v.　　　　　　　　　　　　　　　　　　 )　STATES DISTRICT COURT FOR
　　　　　　　　　　　　　　　　　　　 )　THE EASTERN DISTRICT OF
MAGNUM HUNTER PRODUCTION, INC.,　　 )　KENTUCKY
　　　　　　　　　　　　　　　　　　　 )
　　　Defendant-Appellee/Cross-Appellant.　 )
　　　　　　　　　　　　　　　　　　　 )
_____/　 )

**Before: KEITH, STRANCH, and DONALD, Circuit Judges.**

**DAMON J. Keith, Circuit Judge.** EQT Production Company ("EQT") and Magnum Hunter Production, Inc. ("Magnum Hunter") are in the business of oil and gas production. Over the years, the two entities entered into eleven Farmout Agreements ("FOAs"), where EQT allowed Magnum Hunter to drill and sell oil and gas on EQT's land in exchange for royalty payments. After disagreements arose, EQT audited Magnum Hunter's records, finding that Magnum Hunter failed to make various payments as required by the FOAs. EQT filed suit against Magnum Hunter to recoup some of these missing payments. After conducting a bench trial, the district court awarded damages on some, but not all, of EQT's claims.

EQT and Magnum Hunter filed cross-appeals. For the reasons that follow, the district court's judgment is **REVERSED and REMANDED in part**, and **AFFIRMED in part**.

**I.**

Between 1996 and 2004, EQT and Magnum Hunter, or their predecessors in interest, entered into eleven FOAs. Under these agreements, Magnum Hunter sold the oil and gas it drilled from wells on property owned or leased by EQT. In exchange, Magnum Hunter paid EQT a royalty on the gross proceeds received from the sale of oil and gas. The amount of royalty owed escalated under certain circumstances. The FOAs also required Magnum Hunter to pay EQT a shut-in fee on wells capable of production that are closed for a predetermined amount of time.

In 2008, to comply with new requirements issued by the Federal Energy Regulatory Commission, Magnum Hunter built a processing plant, and began transporting gas from EQT's wells to the plant to remove natural gas liquids ("NGLs") from the gas. Magnum Hunter paid EQT royalties on the NGLs it sold, but deducted post-production costs, including transportation and processing costs, from these royalties.

Over time, the parties began to disagree on their respective rights, responsibilities, and required payments under the FOAs. In 2013, EQT exercised its contractual rights and hired Mercadante & Company, P.C. ("Mercadante") to audit Magnum Hunter's records from 2011 to 2013. The audit report contained specific written "exceptions" indicating that Magnum Hunter had failed to pay certain shut-in fees, royalties, and escalation fees, and that it made unauthorized deductions when calculating royalty payments owed to EQT. The audit identified net exceptions of $2,367,307 owed to EQT for the 2011 to 2013 period. After making adjustments, the parties agreed that Magnum Hunter would pay EQT $1,833,780 (the "Cash Payment") for certain audit exceptions, some of which were extended through August 2015. Magnum Hunter placed EQT's accounts in suspense after the audit.

In December 2015, Magnum Hunter filed for bankruptcy. In response, EQT filed a Proof of Claim in the amount of $5,896,907 for, *inter alia*, unpaid shut-in fees and royalties, underpayment for the sale of NGLs, and improper post-production deductions from royalties. The Proof of Claim sought amounts related to claims from 2002 to 2010, from the Mercadante Audit period (2011 to 2013), and from the post-audit period (2013 to 2015). In April 2016, Magnum Hunter emerged from bankruptcy and honored the previously agreed upon Cash Payment to EQT. The Cash Payment did not include any amounts related to NGLs or claims from 2002 to 2010. EQT reserved the right to pursue the remainder of its claims in a separate proceeding.

In May 2016, EQT filed a complaint in the Eastern District of Kentucky. EQT asserted the following claims: Count I – breach of contract for failure to render payment for wells in production; Count II – breach of contract for failure to render shut-in fee payments; Count III – breach of contract for failure to escalate royalty or overriding royalty percentages after the specified time period; Count IV – breach of contract for failure to escalate royalty or overriding royalty percentages after proceeds from production exceed costs; Count V – breach of contract for improper royalty and overriding royalty deductions; Count VI – prejudgment interest on the Cash Payment; Count VII – unjust enrichment; Count VIII – accounting; Count IX – declaratory relief, and Count X – injunctive relief.

The parties had several disputes throughout the course of litigation. For instance, at the close of discovery, Magnum Hunter claimed it had repeatedly asked EQT to provide evidence detailing how it calculated damages but received only the audit materials. When Magnum Hunter deposed EQT's corporate representative, he could not explain how EQT calculated damages without referring to figures from EQT's internal database. EQT had not provided Magnum Hunter with this data. As a sanction for this violation of discovery rules, the district court precluded EQT

from introducing any evidence at trial on damage calculations it had not provided to Magnum Hunter.

The parties filed cross-motions for summary judgment. In July 2017, the district court, finding that NGLs were not covered by the FOAs, granted partial summary judgment for Magnum Hunter on Count V, to the extent it stated a claim for improper deductions from NGL royalty calculations. The district court also granted summary judgment for Magnum Hunter on the unjust enrichment claim in Count VII, and the requests in Counts VI, VIII, IX, and X for prejudgment interest, declaratory relief, and injunctive relief arising from the unjust enrichment claim. Magnum Hunter's motion for summary judgment for accounting in Count VIII was also granted. The district court granted EQT's motion for partial summary judgment on its breach of contract claim from 2015 to present in Count I, and the corresponding request for prejudgment interest in Count VI.

During the final pretrial conference, the parties agreed to split EQT's claims into three categories: (1) claims arising between 2002 and 2010; (2) claims arising during the audit period of 2011 to 2013; and (3) claims after the audit period. As trial neared, the parties filed objections to each other's list of proposed exhibits. EQT argued that the district court should exclude any of Magnum Hunter's evidence pertaining to its defense that EQT's claims are time-barred by some of the FOAs. The district court ultimately ruled that some of EQT's 2002 to 2010 claims were time-barred by addenda to certain FOAs requiring EQT to raise payment disputes within twenty-four months.

After a two-day bench trial, the district court awarded EQT $454,537 in damages for Count I and $15,537 for Count II, but found that EQT failed to prove it was entitled to damages under Count V. It granted EQT's Count VI claim for prejudgment interest as to Counts I and II at a rate

of 8 percent per annum, and denied EQT's claim for prejudgment interest as to Count V. EQT's claim for declaratory relief under Count IX was also denied. Following these rulings, EQT filed a motion for relief from judgment, which the district court denied.

**II.**

On appeal, EQT argues that the district court: (1) erred in denying EQT's claim for additional royalties on the sale of NGLs; (2) erred in allowing Magnum Hunter to deduct NGL processing costs from royalty payments; (3) abused its discretion in freezing EQT's proof of damages; (4) erred in holding that some of EQT's breach of contract claims for the 2002 to 2010 period were time-barred; and (5) erred in denying EQT's claim for prejudgment interest on the Cash Payment. Magnum Hunter argues on cross-appeal that the district court: (1) erred in awarding EQT damages for unpaid shut-in fees; (2) erred in rejecting Magnum Hunter's claim for a $454,753 credit; and (3) abused its discretion in awarding EQT prejudgment interest.

**A. NGL Royalties**

Before discovery closed, Magnum Hunter moved for partial summary judgment on EQT's claim for unauthorized deductions relating to NGL royalties, arguing that the FOAs are silent on NGLs. Magnum Hunter argued in part that it did not have to pay EQT royalties on NGLs produced. However, this argument does not advance the parties' intent in entering into the contracts and is meritless.

All the FOAs state that Magnum Hunter is to pay EQT a royalty on the gross proceeds Magnum Hunter receives from the sale of "oil and/or gas" drilled from wells, without deductions of any kind. Seven of the FOAs incorporate by reference a Model Form Operating Agreement ("MOA"), which says "[t]he term 'Oil and Gas' shall mean oil, gas, casinghead gas, gas condensate, and/or all other liquid or gaseous hydrocarbons and other marketable substances

produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated." Eight of the FOAs define "oil well" to mean "oil well as defined by Kentucky Revised Statute Number KRS 353.010," and "gas well" to mean "gas well as defined by Kentucky Revised Statute Number KRS 353.010." Section 353.010 defines "gas well" as any well that "(a) Produces natural gas not associated or blended with crude petroleum oil any time during production; or (b) Produces more than ten thousand (10,000) cubic feet of natural gas to each barrel of crude petroleum oil from the same producing horizon." KY. REV. STAT. ANN. § 353.010(10) (West 2009). "'Oil well' means any well which produces one (1) barrel or more of oil to each ten thousand (10,000) cubic feet of natural gas." *Id*. § 353.010(14).

In ruling on Magnum Hunter's motion for summary judgment, the district court divided the FOAs into three subsets: "(1) FOAs that define 'oil well' and 'gas well' and attach and incorporate an MOA defining 'oil and gas'; (2) FOAs that define 'oil well' and 'gas well' but do not attach and incorporate an MOA defining 'oil and gas'; and (3) FOAs that do not define 'oil well' and 'gas well' and do not attach and incorporate an MOA defining 'oil and gas.'" R. 77, Summary Judgment Order, Page ID 4552. For the first category, the district court observed that "[w]hile the terms 'oil well' and 'gas well' are not synonymous with the phrase 'oil and/or gas,' they are closely related." *Id.* at Page ID 4553. The district court found a conflict between the FOAs and the attached MOAs "[b]ecause the MOA definition embraces all types of substances produced as [a] result of oil and gas exploration, while the FOAs contemplate only the production of natural gas and petroleum." *Id.* at Page ID 4553–54. The FOAs state that in the event of a conflict between the terms of the FOA and any attachment, the terms of the FOA control. Because the statutory definitions of wells referenced in the FOAs mention only "natural gas," the district court found that NGLs were not included within the phrase "oil and/or gas." The district court

used the same rationale to find that FOAs within the second category also exclude NGLs. For the third category, the district court used the dictionary definitions of "gas" and "liquid" to exclude NGLs. The district court granted partial summary judgment for Mangum Hunter on this claim.

"We review de novo a district court's order granting summary judgment . . . ." *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 806 (6th Cir. 2015). In diversity cases, federal courts apply the substantive law of the forum state. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Wahl v. GE*, 786 F.3d 491, 494–95 (6th Cir. 2015). The parties agree that the FOAs are governed by Kentucky law. "[T]he interpretation of a contract … is a question of law for the courts and is subject to *de novo* review." *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002).

When interpreting a contract, "[t]he primary objective is to effectuate the intentions of the parties." *3D Enters. Contracting Corp. v. Louisville & Jefferson Cty. Metro. Sewer Dist.*, 174 S.W.3d 440, 448 (Ky. 2005). "Any contract or agreement must be construed as a whole, giving effect to all parts and every word in it if possible." *Louisa v. Newland*, 705 S.W.2d 916, 919 (Ky. 1986). A contract is ambiguous when it is susceptible to inconsistent interpretations. *Transp. Ins. Co. v. Ford*, 886 S.W.2d 901, 905 (Ky. Ct. App. 1994). "Where a contract is ambiguous or silent on a vital matter, a court may consider parol and extrinsic evidence involving the circumstances surrounding execution of the contract, the subject matter of the contract, the objects to be accomplished, and the conduct of the parties." *Cantrell Supply*, 94 S.W.3d at 385. Where no ambiguity exists, the parties' intentions must be discerned from the four corners of the contract. *Id.*

On appeal, EQT argues that the district court's interpretation of the FOAs with attached MOAs rendered the definition of "oil and/or gas" meaningless. We agree. The MOAs define "oil

and gas," and as the district court noted, this definition covers all liquid and gaseous substances produced within the wells, which would include NGLs. However, the district court chose not to give effect to this definition, and instead considered the statutory definition for "oil well" and "gas well," even though it said these terms are not synonymous with the phrase "oil and/or gas." The FOAs that incorporate the MOAs are not silent on the definition of "oil and/or gas" and are not ambiguous. Nor does the MOA definition of "Oil and Gas" contradict the incorporated statutory definition of wells. A well matches the statutory definitions if it produces natural gas and crude oil in certain proportions. Refining some of the natural gas produced at a covered well to create NGLs does not change the nature of the well. As EQT argues, the district court's ruling creates inconsistency in the contract terms where none existed and should be reversed.

The FOAs that do not incorporate the MOAs are silent on the definition of "oil and/or gas." We therefore presume that the contracts reference the ordinary meanings of the term. In this context, there is no dispute that "gas" means "natural gas." NGLs are produced from natural gas. To the extent the FOAs are silent or ambiguous as to whether components or byproducts of natural gas are included within the term "gas," the court can look to extrinsic evidence, such as the subject matter of the contract and the parties' conduct, to interpret those FOAs. The parties entered into an agreement with the purpose of producing and selling oil and gas. EQT allowed Magnum Hunter to drill wells on its lands, and sell oil and gas produced from those wells. In exchange, Magnum Hunter was to pay a royalty on the gross proceeds from these sales. This purpose was not lost to Magnum Hunter, who for nearly six years, paid royalties to EQT on NGLs it extracted from the wells and sold. At one time, the parties had an understanding that NGLs were covered under the FOAs, and such an understanding upholds the purpose of the contract. Indeed, if NGLs were not covered by the FOAs, it is unclear what authority Magnum Hunter would have had to extract them

from EQT's property. The district court's ruling defeats the parties' intended purpose for contracting with each other, and we reverse the district court's determination that NGLs are not included in the FOAs.

**B. NGL Post-Production Costs**

Magnum Hunter subtracted NGL post-production costs from the NGL sale price and then calculated the total oil and gas royalty it owed EQT based on that reduced figure. The district court found that these deductions did not violate the FOAs since NGLs are not subject to the FOAs. On appeal, EQT argues that the district court erred in its holding. Given the language of the FOAs and market practice, we conclude that these deductions were indeed proper, though not for the reasons articulated by the district court.

Magnum Hunter argues that Kentucky law allows for the deduction of post-production expenses on royalty payments. "If the gas is not sold at the well-head, but is refined or processed in some way and moved to a place of sale downstream from the well, … in calculating 'royalty,' the lessee may deduct from its downstream receipts any 'post-production' costs incurred to market the gas." *Baker v. Magnum Hunter Prod., Inc.*, 473 S.W.3d 588, 592 (Ky. 2015). In other words, "'at-the-well' refers to gas in its natural state, before the gas has been processed or transported from the well." *Poplar Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.*, 636 F.3d 235, 244 (6th Cir. 2011). In Kentucky, when an agreement is "silent as to the place of market and the price of the gas," the default royalty calculation is the "at the well" rule, which allows deductions for post-production costs. *Baker*, 473 S.W.3d at 593 (first quote quoting *Reed v. Hackworth*, 287 S.W.2d 912, 913 (Ky. 1956); *see also Reed*, 287 S.W.2d at 913–14 ("We conclude that where, as here, the lease is silent concerning the place of market and the price, the royalty should be applied to the fair market value of gas at the well."). Post-production costs are expenses Magnum Hunter incurs

"after the gas leaves the wellhead," including "gathering, compression, and treatment costs." *Poplar Creek*, 636 F.3d at 238–39 (call numbers omitted).

Therefore, the key question is whether the FOAs are silent about the place of market and price of gas. The relevant contractual language provides that EQT is entitled to a set percentage "of the gross proceeds received from the sale of oil and/or gas" drilled from wells "without deductions of any kind." This language does not set the place of market or the price, so the application of the at-the-well rule is appropriate.

EQT, however, points to the prohibition on "deductions of any kind" and submits that the contracts are not silent. There is some intuitive appeal to this position. But a prohibition on deductions simply does not explain where gas is to be sold or for how much—the two pieces of information Kentucky courts have explained could halt application of the at-the-well rule. Further, application of the at-the-well rule does not render the prohibition on deductions meaningless. Magnum Hunter remains unable to deduct "production costs, like those incurred drilling, operating and maintaining a well, as well as other costs incurred in order to extract gas from the earth and bring it up to the wellhead." *Poplar Creek*, 636 F.3d at 239 (brackets and citation omitted).

Interpreting this contractual language to permit application of the at-the-well rule is also consistent with precedent. This court's recent decision in *Poplar Creek* cited favorably to a much older decision, *Lafitte Co. v. United Fuel Gas Co.*, 284 F.2d 845 (6th Cir. 1960). There, the relevant contractual language—similar to the FOAs' language—provided for a royalty that was "one-eighth (1/8) of the gross income received by the Lessee from the sale … of gas produced and sold … from the demised premises." *Poplar Creek*, 636 F.3d at 241 (quoting *Lafitte Co. v. United Fuel Gas Co.*, 177 F. Supp. 52, 56 (E.D. Ky. 1959)). The *Lafitte* court upheld the district court's finding that the lease was silent with respect to the market place and price and so allowed for

deduction of post-production transportation costs. 284 F.2d at 849. Because "gross" means "undiminished by deduction," *Gross*, *Black's Law Dictionary* (10th ed. 2014), we find no meaningful distinction between the contractual language in *Lafitte* and the contractual language here.

Because the FOAs are silent as to the market place or price, and because the parties have not specifically contracted against application of Kentucky's default at-the-well rule, Magnum Hunter may properly deduct post-production costs from the royalties it pays on NGLs. On remand, the district court should determine EQT's damages, if any, on unpaid NGL royalties, calculated after deducting post-production costs.

## C. Discovery Sanction

EQT argues that the district court abused its discretion when it prohibited EQT from introducing evidence of its damages. The district court referred discovery matters to a magistrate judge. After discovery closed, the parties contacted the magistrate judge to resolve a dispute. EQT had not timely produced to Magnum Hunter information from its internal database called "Enertia" which EQT used to make or support its damages calculation. Magnum Hunter deposed EQT representative John Bergonzi ("Bergonzi"), who said that to calculate damages EQT supplemented the Mercadante Audit with data from a query in the Enertia system. This Enertia data, downloaded into spreadsheets, is integral to understanding how EQT calculated its damages. Only after Magnum Hunter deposed Bergonzi, and after the discovery cutoff, did EQT provide Magnum Hunter with an Enertia data report that supported its calculations. Subsequently, the magistrate judge, under Fed. R. Civ. P. 37(c)–(d), provisionally prohibited EQT from using any damage proof in further proceedings it had not already provided to Magnum Hunter as of the Bergonzi deposition. EQT then filed objections, which the district court overruled.

During the bench trial, the district court allowed Plaintiff's Exhibit 52 ("P-52") to be presented by avowal only, finding that the exhibit, allegedly showing that Magnum Hunter made improper deductions on EQT's royalties prior to 2010, was precluded by the district court's prior discovery order freezing EQT's proof. EQT filed a motion for relief from judgment, challenging the district court's ruling on P-52, which the district court denied. EQT challenges this ruling again on appeal.

We review discovery orders for an abuse of discretion. *Bill Call Ford, Inc. v. Ford Motor Co.*, 48 F.3d 201, 209 (6th Cir. 1995). "A district court abuses its discretion when it relies on erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment." *Ondo v. City of Cleveland*, 795 F.3d 597, 603 (6th Cir. 2015) (citation and internal quotation marks omitted). Under the rules governing discovery, a party seeking damages is required to provide to the other party a "computation of each category of damages," and to "make available for inspection and copying … the documents or other evidentiary material … on which each computation is based." Fed. R. Civ. P. 26(a)(1)(A)(iii). "If a party fails to provide information … as required by Rule 26(a) or (e), the party is not allowed to use that information … to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

"A noncompliant party may avoid sanction if there is a reasonable explanation of why Rule 26 was not complied with or the mistake was harmless." *Howe v. City of Akron*, 801 F.3d 718, 747 (6th Cir. 2015) (citation and internal quotation marks omitted). We adopted the following factors from the Fourth Circuit in assessing whether a party's omitted or late disclosure is "substantially justified" or "harmless":

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the

evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Id.* at 748 (quoting *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396–97 (4th Cir. 2014)).  In that seminal case on the issue of discovery sanctions, we explained that all five factors suggested that plaintiffs' late disclosure of their backpay calculations was harmless and so reversed the district court's exclusion of those calculations as an abuse of discretion.  *Id.* at 748–50.

EQT argues, as it did before the magistrate judge, that the *Howe* factors weigh in its favor. The magistrate judge extensively analyzed EQT's arguments under the *Howe* factors in finding that EQT's late disclosure was not substantially justified or harmless.  We address each of these factors in turn.

First, EQT argues that Magnum Hunter did not suffer genuine surprise by EQT's belated Enertia data disclosure because Magnum Hunter possessed the same data EQT used to develop its Enertia worksheets.  But as the magistrate judge observed, while the raw data may have originated from Magnum Hunter, because EQT failed to disclose the worksheets, Magnum Hunter was not aware of how Enertia processed the raw data, which of the charges from a thirteen-year period EQT took issue with, or how EQT otherwise used Enertia to calculate damages.  This complex commercial dispute between sophisticated businesses is not analogous to the situation we confronted in *Howe*.  There, employees were not penalized for late disclosures because their calculations depended on salary rates and work schedules that, of necessity and by law, were kept by the defendant employer until their belated disclosure.  *Id.* at 748.  EQT further argues that Magnum Hunter knew the method EQT used to calculate damages because it was set out in the FOAs and audit report, and Magnum Hunter used this same method to develop P-52 shortly before trial.  However, this argument is refuted by EQT's own witness, Bergonzi, who testified at his deposition that EQT supplemented the Mercadante Audit with Enertia-generated data to calculate

damages. This method is not set out in the FOAs. EQT also argues that Magnum Hunter had ample opportunity to question Bergonzi about EQT's damage calculation method. But as the magistrate judge observed, Bergonzi did not have the Enertia data at the time of his deposition, so Magnum Hunter did not have a meaningful opportunity to question him on EQT's methodology. The district court correctly adopted the magistrate judge's finding that there was surprise in EQT's late disclosure.

The second and third factors are a party's ability to cure the surprise and potential disruption to the trial. EQT argues that any surprise was curable because Magnum Hunter could have questioned EQT's witnesses about the Enertia data through additional depositions or at trial. It also argues that that the introduction of the Enertia data would not have disrupted trial because it provided Magnum Hunter with the data months before trial. In considering these two factors, the magistrate judge reasonably observed that EQT's late disclosure would have been disruptive to Magnum Hunter at trial, as Magnum Hunter would have had to spend the months leading up to trial reviewing the belated Enertia data and re-deposing Bergonzi rather than preparing for trial. EQT's proposed solution would require Magnum Hunter, the non-defaulting party, to bear the effort and expense necessary to cure EQT's failure to disclose. This would arguably reward EQT for its untimeliness and does nothing to deter similar conduct from future litigants. *See NHL v. Metro. Hockey Club*, 427 U.S. 639, 643 (1976). On the other hand, we have held that the ability to cross-examine witnesses about late disclosures during trial both provided an opportunity to remedy surprise and minimized impact on the trial. *See Howe*, 801 F.3d at 749 (finding an opportunity to remedy surprise in part because "Akron could have explored the problems with Carr's method for calculating back pay by cross-examining Carr and the other twenty-two Plaintiffs during the retrial," and holding trial was not significantly disrupted because, "[w]hen the

Plaintiffs disclosed Exhibit 208, the retrial had not commenced, and therefore Akron still had an opportunity to cross-examine Carr, Snyder, and the other twenty-one Plaintiffs"). These two factors therefore seem to be neutral, not pulling clearly in favor of or against imposition of the discovery sanction.

Fourth, EQT argues that the importance of the evidence weighs in its favor because the district court's sanction effectively dismissed a substantial portion of one of its claims. According to EQT, because it was barred from introducing any evidence on its damages from 2002 to 2010, the district court dismissed that subset of Count V. The district court ultimately ruled that EQT "failed to prove damages from alleged improper deductions [from 2002 to 2010] . . . and thus cannot prevail on a breach of contract claim under Kentucky law." R. 122, Findings of Fact, Page ID 5572. The court stated in a footnote that it had previously "held that contractual language requiring certain claims to be brought in a 24-month period barred EQT from pursuing some claims in this case," but explained that "because the Court finds that EQT has failed to prove damages on these claims the Court sees no reason to revisit or further examine [EQT's other] arguments." *Id.* The district court seems to have relied exclusively on the lack of admissible evidence to support its dismissal of the 2002 to 2010 claims. Because of the discovery sanction, EQT lost on a substantial portion of its claim. The excluded evidence was therefore highly important.

Finally, EQT argues that its conduct was justified because it reasonably believed it had provided Magnum Hunter sufficient information, since the Proof of Claim and its complaint set forth the category, methodology, and amount claimed in Count V. Again, Bergonzi stated at his deposition that EQT used Enertia data to calculate its claim for damages. As the magistrate judge observed, EQT, as the "master of its claim," should have been aware of the basis of its calculation. Consequently, EQT's purported excuse is unavailing, as it should have known that the

methodology described in its complaint did not fully disclose its damage computations, as required by Rule 26. And unlike in *Howe*, EQT was not forced to wait for belated disclosures from Magnum Hunter before it could perform its calculation. *See Howe*, 801 F.3d at 749 ("Akron refused to provide [the actual hours and payrates of the suing employees] until the last possible day, but insisted that the Plaintiffs provide their back-pay calculations before that time."). Thus, the district court did not abuse its discretion in upholding the magistrate judge's conclusion that EQT's failure to disclose was not substantially justified or harmless.

According to the above analysis, two factors favor barring the evidence, one disfavors barring it, and two are neutral. Balancing marginal cases is a classic exercise of discretion. Even though another court might have struck a different balance, the district court did not rely on erroneous findings of fact or apply an incorrect legal standard, and thus did not abuse its discretion in proceeding as it did.

EQT also argues that during trial, the district court erroneously expanded the scope of its discovery order when it excluded P-52 from evidence. A week before trial, the district court ordered Magnum Hunter to supply data on some FOAs from 2002 to 2010. EQT provided this data as an exhibit, which the district court allowed to come in only by avowal, finding that it was covered under its prior discovery order freezing EQT's proof. Specifically, EQT argues that P-52 was not subject to the district court's discovery order because it was data in Magnum Hunter's possession that it refused to disclose before the eve of trial. In effect, EQT challenges the district court's evidentiary ruling.

We review evidentiary rulings by the district court for abuse of discretion. *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 378 (6th Cir. 2009). Additionally, "[t]his court typically defers to a district court's interpretation of its order and reviews for abuse of discretion because

the district court is obviously in the best position to interpret its own order." *Satyam Comput. Servs. v. Venture Global Eng'g, LLC*, 323 F. App'x 421, 430 (6th Cir. 2009) (citation and internal quotation marks omitted).

EQT raised these same arguments in its motion for relief from judgment. In rejecting EQT's arguments, the district court said EQT failed to fully grasp the district court's order. In explaining its discovery order, the district court said that it

> *froze* EQT's proof to what it had offered at the time of the Bergonzi deposition because EQT failed to turn over Enertia data. As such, the [district court] precluded EQT from offering *any* additional damages proof, regardless of whether EQT had the information at the time of the Bergonzi deposition or not. The [district court] did not provide an exception for things not yet produced or created.

R. 128, Motion for Relief from Judgment Order, Page ID 5715. "The [d]istrict [c]ourt's interpretation of its own order is certainly entitled to great deference." *Kendrick v. Bland*, 931 F.2d 421, 423 (6th Cir. 1991). The district court imposed the sanction because EQT did not disclose data that it should have. Allowing EQT to offer P-52 as damage proof would, as the district court recognized, permit it to circumvent the sanction "by introducing new documents it did not have prior to the Bergonzi deposition." R. 128, Page ID 5715.

The district court did not commit a clear error of judgment, and we affirm the discovery sanction and evidentiary ruling.

**D. Contractual Time Bar**

EQT brought claims alleging that Magnum Hunter violated the parties' contracts during the 2002 to 2010 period. EQT argues that the district court erroneously found that provisions—adopted from the Council of Petroleum Accountants Societies ("COPAS")—attached to some of the FOAs barred EQT from bringing claims from 2002 to 2010. Five of these FOAs contain language requiring EQT to take written exception to payments received by Magnum Hunter within

twenty-four months. Prior to trial, Magnum Hunter argued that the COPAS provision barred EQT from bringing the 2002 to 2010 claims because EQT did not take written exception to payments in this period within twenty-four months, as required. The district court prohibited EQT from seeking damages on the five FOAs that limit the time to bring claims.

Because we ruled that the district court properly imposed discovery sanctions on EQT's claims, which effectively dismissed its 2002 to 2010 claims, we need not discuss whether the district court erred in alternatively dismissing these claims under a contractual time bar.

**E. Prejudgment Interest on Cash Payment**

EQT argues that it was entitled to prejudgment interest on the $1,833,780 pre-trial Cash Payment. It sought this prejudgment interest in Count VI of its complaint. The district court did not rule on this issue in its Findings of Fact and Conclusions of Law, and EQT made the request again in its motion for relief from judgment. The district court ultimately denied EQT's request for prejudgment interest on the Cash Payment. We agree.

We review a district court's denial to award prejudgment interest for an abuse of discretion. *Howe*, 801 F.3d at 750. Because this is a diversity case, this decision is governed by Kentucky law. *See Conte v. Gen. Housewares Corp.*, 215 F.3d 628, 633 (6th Cir. 2000). "The longstanding rule in [Kentucky] is that prejudgment interest is awarded as a matter of right on a liquidated demand, and is a matter within the discretion of the trial court or jury on unliquidated demands." *3D Enters.*, 174 S.W.3d at 450. "Liquidated claims are of such a nature that the amount is capable of ascertainment by mere computation, can be established with reasonable certainty, can be ascertained in accordance with fixed rules of evidence and known standards of value, or can be determined by reference to well-established market values." *Id.* (citation and internal quotation marks omitted). "Absent a contractually agreed upon rate, the appropriate rate of interest is

governed by statute. KRS 360.010 … provides that the legal rate of interest is eight (8%) percent per annum." *Reliable Mech., Inc. v. Naylor Indus. Servs., Inc.*, 125 S.W.3d 856, 857 (Ky. Ct. App. 2003) (internal quotation marks omitted).

EQT argues that the Cash Payment was liquidated because it was a definite sum determined by mere computation. It also claims that the Bankruptcy Court's order preserved its right to seek prejudgment interest on the Cash Payment. However, as the district court noted, Magnum Hunter made the Cash Payment to EQT after the two parties came to an agreement in private negotiations, not because the district court ordered Magnum Hunter to do so. The Cash Payment was not a part of this dispute, so there was no "liquidated demand" for the district court to award prejudgment interest on. In private negotiations, EQT could have sought interest, and we will not change the terms of the settlement the parties reached. Accordingly, the district court did not abuse its discretion in denying EQT prejudgment interest on the Cash Payment.

**F. Shut-in Fees**

Magnum Hunter on cross-appeal argues that the district court erred in awarding EQT damages for unpaid shut-in fees, which EQT sought in Count II of its complaint. The FOAs contain language requiring Magnum Hunter to pay EQT either $500 or $600 in fees per year, per well not in production. The Mercadante Audit found that Magnum Hunter failed to pay shut-in fees on multiple wells for which EQT did not receive production payments. The Cash Payment covered the shut-in fees for the 2011 to 2013 audit period, in the amount of $15,537, but did not cover any unpaid shut-in fees after the audit period. EQT contacted Mercadante for advice regarding damage calculations for the 2013 to 2015 period, and Mercadante suggested extrapolating the 2011 to 2013 calculation as an estimate for 2013 to 2015. Magnum Hunter objected to this extrapolation, but the district court found it "logical that the amount of fees and

royalties owed on the FOA wells for the 2011 to 2013 period would be close to the amounts owed on the same wells for the subsequent two-year period." R. 77, Page ID 4566. "Using the extrapolation method, the [district court found] that Magnum Hunter owes EQT $15,537 for unpaid shut-in fees from 2013-present." R. 122, Findings of Fact, Page ID 5568.

This court reviews the district court's calculation of damages for clear error because "questions raised concerning damages are essentially questions of fact." *Canderm Pharmacal, Ltd. v. Elder Pharms., Inc.*, 862 F.2d 597, 606 (6th Cir. 1988); *see also Eagle Supply & Mfg., L.P. v. Bechtel Jacobs Co.*, 868 F.3d 423, 431 (6th Cir. 2017). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Atkins*, 843 F.3d 625, 632 (6th Cir. 2016) (citation and internal quotation marks omitted). "Where it is reasonably certain that damage has resulted, mere uncertainty as to the amount does not preclude one's right of recovery or prevent a jury decision awarding damages." *Johnson v. Cormney*, 596 S.W.2d 23, 27 (Ky. Ct. App. 1979), *overruled on other grounds by Marshall v. Paducah*, 618 S.W.2d 433 (Ky. Ct. App. 1981). "Kentucky law does not require [a claimant] to provide exact calculations of its damage—an estimation may suffice if it proves damages with reasonable certainty." *Gibson v. Ky. Farm Bureau Mut. Ins. Co.*, 328 S.W.3d 195, 205 (Ky. Ct. App. 2010) (internal quotations marks omitted).

Magnum Hunter argues that an EQT representative testified at trial that all the Mercadante Audit exceptions were brought forward through August 2015, so the extrapolation should not have been from 2013 to the present, but only from August 2015 forward. However, the audit report clearly states that the audit covers 2011 to 2013, and the district court found that the Cash Payment did not include shut-in fees for the post-audit period. Neither party disputes that EQT was

damaged by Magnum Hunter's continued failure to pay shut-in fees after 2013. Thus, EQT's reasonably certain estimate of its 2013 to 2015 damages, by extrapolating from its 2011 to 2013 damages, was sufficient. *See Gibson*, 328 S.W.3d at 205 (rejecting plaintiff's argument that an award was not supported by specific evidence, claiming that "[t]here was no itemization, no definitive numbers, just a series of … estimates" (alterations in original)). Magnum Hunter had the opportunity to cast doubt on the estimate by, for example, proving that certain wells were no longer shut-in. It did not do so. The district court did not err in awarding EQT damages for unpaid shut-in fees for Count II.

**G. Credit Claim**

Magnum Hunter argues that the district court erred in denying its claim for a $454,753 credit. At trial and in post-trial filings, Magnum Hunter claimed that after making the Cash Payment of $1,833,780 to satisfy the Mercadante Audit claims—which, according to Magnum Hunter, should have been reduced to $1,379,027 after the district court dismissed the NGL-related claims and after EQT did not pursue an audit exception in its complaint—it was entitled to a credit. However, as the district court observed, evidence at trial, including Magnum Hunter's own witness report, shows that only $1,232,597 of the Cash Payment went towards satisfying the 2011 to 2013 audit claims. The district court also found that none of the Cash Payment covered NGL royalties. The rest of the Cash Payment went towards satisfying audit exceptions that had been rolled through 2015, and other claims. The district court rightfully denied Magnum Hunter's claim for a credit.

Magnum Hunter argues that conflicting accounts between EQT's pleadings and its trial testimony creates confusion on this issue. However, the evidence shows that only a portion of the Cash Payment was used to satisfy the Mercadante Audit claims and that no portion of it was for

NGLs, meaning Magnum Hunter did not overpay. There is no confusion, and the evidence supports the district court's denial of Magnum Hunter's credit claim.

**H. Prejudgment Interest on Unpaid Royalties and Shut-in Fees**

EQT sought prejudgment interest on damages for unpaid royalties and shut-in fees, which Magnum Hunter also challenges on cross-appeal. The district court granted summary judgment on Count I of EQT's complaint for unpaid royalties from 2015 to 2017. "In particular, the [district court] found Magnum Hunter breached the FOAs when 'Magnum Hunter suspended payments to EQT, resulting in a cessation of payments required by the FOAs.'" R. 122, Page ID 5564. The district court awarded EQT a $454,537 judgment on Count I, as well as prejudgment interest. As stated above, the district court awarded a $15,537 judgment for unpaid shut-in fees on Count II, with prejudgment interest.

Magnum Hunter argues that the district court abused its discretion in awarding prejudgment interest on these claims, characterizing them as unliquidated. However, the district court used trial and post-trial evidence to reasonably calculate damages on unpaid royalties. The district court reasonably calculated damages on unpaid shut-in fees, as detailed above. As the district court held and demonstrated, EQT's claims for unpaid royalties and shut-in fees are capable of ascertainment by mere computation, and are thus liquidated. *3D Enters.*, 174 S.W.3d at 450; *see also Friction Materials Co. v. Stinson*, 833 S.W.2d 388, 392 (Ky. Ct. App. 1992) ("This is a breach of contract case, and although the amount claimed was vigorously disputed, the amount was readily ascertainable. Interest should follow as a matter of course for what in substance is an unpaid debt."). The district court did not abuse its discretion in awarding EQT prejudgment interest.

**III.**

For the foregoing reasons, the district court's judgment with respect to the NGL royalties in Count V is **REVERSED in part**, and the remainder of its judgment is **AFFIRMED**.  The case is **REMANDED** for the limited purpose of determining what royalties, if any, EQT is owed on NGLs, where the royalty is calculated after deducting post-production costs.