NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0069n.06

No. 22-6040

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

JERVIS MIDDLETON,

    Plaintiff-Appellant,

v.

LEXINGTON-FAYETTE COUNTY URBAN
GOVERNMENT dba LEXINGTON POLICE
DEPARTMENT, et al.,

    Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF KENTUCKY

OPINION

---

**Before: COLE, GILMAN, and LARSEN, Circuit Judges.**

GILMAN, J., delivered the opinion of the court in which LARSEN, J., joined in full, and COLE, J., joined in part. COLE, J. (pp. 19–30), delivered a separate opinion concurring in part and dissenting in part.

**RONALD LEE GILMAN, Circuit Judge.** Jervis Middleton, a Black police officer, served in the Lexington Police Department (LPD) for 13 years. In February 2021, Middleton was terminated for disseminating confidential police communications to his cousin and local community organizer Sarah Williams. Williams led the 2020 police-accountability protests in Lexington, Kentucky following the highly publicized murder that year of George Floyd in Minneapolis.

Two months after his termination, Middleton filed suit against the LPD (and subsequently LPD Chief Lawrence Weathers) in the Fayette County Circuit Court. Middleton raised several claims arising under Section 344 of Kentucky's Civil Rights Act, a breach-of-contract claim pursuant to the Fraternal Order of Police's collective bargaining agreement, and a First

Amendment retaliation claim under 42 U.S.C. § 1983. The LPD and Weathers later removed the case to the United States District Court for the Eastern District of Kentucky. They subsequently moved for summary judgment in their favor, which motion the district court granted in its entirety. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

Middleton joined the LPD in 2007, where he served as a negotiator, firearms and defensive-tactics instructor, public-information officer, and member of the Honor Guard. He eventually attained the rank of sergeant, winning several awards in the process.

Throughout Middleton's tenure with the LPD, a number of White officers targeted both him and the Black public with racial hostility. In 2012, for instance, one officer entered the home of an ex-girlfriend without her consent to physically and verbally assault her for being a "n****r lover." That officer was suspended for six months for his conduct rather than being terminated. Middleton says that another officer was the subject of multiple complaints alleging racial discrimination. This other officer was not disciplined for any of these complaints. According to Middleton, this inaction exemplified the LPD's pattern of ignoring citizen complaints of racial discrimination.

Middleton, moreover, was repeatedly the target of racial abuse himself. During a crisis-negotiation training session in 2018, Middleton says that a sergeant ordered him to "turn your Black-ass face around." At a separate training, that sergeant told Middleton that "[y]ou know you're the only Black person here. Don't nobody want you here in here." When Middleton reported these racist comments to his superior, no action was taken to address the situation. That superior repeatedly referred to Middleton as a "token boy," which Middleton understood to imply that he was promoted solely because he was Black.

In 2018, Middleton was told that five racist memes were circulating in the LPD that depicted him in various settings with White women who appeared frightened Middleton informed his supervisors of the memes, but no action was taken. But when an offensive meme of a White officer was circulated three years later, the officer who created the meme faced review by the LPD Disciplinary Review Board.

On another occasion, Middleton returned home one day to find the statement "you've been punked black bitch" spelled out in sticky notes on his garage door. When he notified his supervisor, she responded: "Is that all you've got? I'm going home." That supervisor also acknowledged that while Middleton was a probationary sergeant under her command, she did not recommend him for a promotional appointment. She further conceded that this was the only time that she had declined to make such a recommendation.

Middleton and his wife separated in June 2018. In August 2018, Middleton's ex-girlfriend contacted the LPD to inform the department that she believed Middleton was on her garage roof looking into her window while she was home with her new boyfriend. She believed that Middleton had improperly used the police database to search for information about her new relationship. Criminal charges of Second-Degree Official Misconduct were brought against Middleton, but he was later acquitted of any criminal wrongdoing.

After Middleton's acquittal, the LPD's Public Integrity Unit (PIU) conducted an internal investigation into Middleton's actions and submitted a report to Chief Weathers. The report concluded that Middleton had used other officers to run the license plates of his ex-girlfriend's new boyfriend and subsequently had asked the officers to drive by her home. Middleton was found to have misled the officers into believing that his requests were for legitimate reasons According to Middleton, however, he ordered the officers to run the license-plate numbers at his

ex-girlfriend's behest because she was concerned for her safety from her ex-husband, who had shown up to her house several times to call her a "n****r lover."

Weathers referred the issue to the Disciplinary Review Board. The Board recommended termination, but Weathers instead proposed a demotion and a three-month suspension. Middleton rejected Weathers's proposal, so the matter proceeded to a disciplinary hearing before the Lexington City Council. Meanwhile, the local police union filed a grievance on Middleton's behalf, alleging noncompliance with the procedural requirements of the collective bargaining agreement. Middleton alleged that LPD's actions were due to racial discrimination.

The dispute was resolved before the disciplinary hearing, culminating in a Settlement Agreement. According to the Settlement Agreement, Middleton was demoted to "an officer," but would remain eligible for the next promotion cycle. The Settlement Agreement described his misconduct as a misuse of department resources and time. As part of the settlement, Middleton agreed to withdraw his union grievance, as well as "any claim of any nature whatsoever arising from, or that otherwise could have arisen from, the investigation, discipline, or process related to the disciplary matter resolved" by the Settlement Agreement.

Following George Floyd's murder in May 2020, Middleton supported local Black activists protesting for police accountability by "liking" social media posts and attending one of the protests while he was off duty. On June 1, 2020, Sarah Williams—Middleton's cousin and a local community organizer—thanked an unnamed police officer on social media for marching with the protestors. Rumors in the LPD soon began to circulate that Middleton had supplied personal and confidential information about the undercover police officers monitoring the protests to the protest organizers.

On June 14, 2020, the LPD arrested Sarah Williams for disorderly conduct and inciting a riot. Soon thereafter, a warrant to extract Williams's phone data was executed Williams's phone data revealed Facebook messages between Middleton and Williams wherein Middleton described a history of White officers discriminating against Black people, acting in an openly racist manner toward Black officers, and committing various acts of alleged misconduct without punishment. The messages also revealed that Middleton had identified undercover police officers at various protests for Williams's benefit and had monitored LPD's radio on her behalf. He also supplied Williams with personal details about individual officers and shared LPD tactics and communications with her. Middleton, however, maintains that Williams did not use this information against the police officers at the protests. He also disputes that he shared information that he was not permitted to disclose.

Middleton was thereafter placed on administrative reassignment. The LPD subsequently filed a second formal disciplinary action against him. Three charges of misconduct were filed for (1) disseminating two screenshots of LPD internal communications, (2) encouraging Williams to verbally confront officers with disparaging information about them, and (3) lying during an interview with the PIU concerning whether Middleton monitored the LPD radio on Williams's behalf. In October 2020, the LPD's Disciplinary Review Board voted to terminate Middleton. This time Chief Weathers agreed with the decision. And in a hearing before the Lexington City Council in February 2021, the City Council upheld Middleton's termination.

Middleton filed suit two months later against the LPD (and later Weathers) in the Fayette County Circuit Court. He raised claims for a hostile work environment, disparate treatment, disparate impact, and workplace retaliation arising under Section 344 of Kentucky's Civil Rights Act. Middleton also alleged a breach-of-contract claim under the police union's collective

bargaining agreement and a First Amendment retaliation claim. In June 2021, this action was removed to the United States District Court for the Eastern District of Kentucky.

The LPD and Weathers subsequently moved for summary judgment in their favor. The district court granted the motion in its entirety in November 2022, concluding that (1) Middleton had waived most of his claims as part of his 2019 Settlement Agreement, (2) he had provided insufficient comparators to demonstrate disparate treatment, (3) he had failed to develop his disparate-impact and breach-of-contract claims, and (4) Chief Weathers was protected against Middleton's First Amendment retaliation claim by qualified immunity. This timely appeal followed.

## II. ANALYSIS

### A. Standard of review

We review de novo a district court's grant of summary judgment. *Cash-Darling v. Recycling Equip., Inc.*, 62 F.4th 969, 974–75 (6th Cir. 2023). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When evaluating a summary judgment motion, the reviewing court must construe the facts in the light most favorable to the non-movant." *Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017) (citation omitted). Our task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Doe v. Univ. of Ky.*, 971 F.3d 553, 557 (6th Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–52 (1986)).

**B.** **The district court correctly found that the Settlement Agreement precludes consideration of Middleton's discrimination claims based on events predating the Agreement**

Middleton argues that the district court erred by construing the Settlement Agreement as "broad and encompassing." According to Middleton, this error prevented him from raising employment-discrimination claims against the LPD and Weathers that were based on events predating the Agreement.

The Settlement Agreement consists of two documents: (1) the Agreement of Conformity with KRS § 95.450 and Release, and (2) the Discipline Resolution Agreement. In relevant part, the Agreement of Conformity provides that Middleton

> expressly release[s] and forever discharge[s] the Lexington-Fayette Urban County Government, its officers, agents, employees, and their successors and assigns from all claims, demands, actions, damages or causes of action and from all liability for damages of whatsoever kind, nature o[r] description that [Middleton] ever had, now ha[s] or may have against the aforementioned entities created by or arising out of the action contained herein.

The Discipline Resolution Agreement further states that Middleton

> waives and releases . . . any claim of any nature whatsoever arising from, or that otherwise could have arisen from, the investigation, discipline, or process related to the disciplinary matter resolved by the Letter of Conformity and this Agreement . . . relat[ed] to any claim arising prior to the date of Middleton's return to work from administrative leave without pay[.]

> [A]ny pending grievance that may remain filed by Middleton or on his behalf by the Fraternal Order of Police, Bluegrass Lodge #4, is also resolved or hereby withdrawn. Therefore, no further action is necessary or will be taken as to such grievance.

The Discipline Resolution Agreement's broadest waiver provision states that Middleton "waives and releases . . . any claim of any nature . . . arising from, or that otherwise could have arisen from, the investigation, discipline, or process related to the disciplinary matter resolved by . . . this Agreement . . . relat[ed] to any claim arising prior to the date of Middleton's return to work." The "disciplinary matter" referred to above is described as Middleton's "contact[ing]

numerous officers" to "query license plate information about vehicles which were observed" at a residence, but failing to "disclose to the officers any reason for his requests" and failing to "follow Departmental policy before requesting additional patrol activities." In response to the disciplinary matter, Middleton filed a union grievance. That "pending [union] grievance" filed on Middleton's behalf alleged, among other things, that "LPD's actions, including the severity of the discipline in contrast [to] prior disciplinary outcomes involving other officers, were discriminatory and based upon [] Middleton's race."

Middleton asserts that the Discipline Resolution Agreement's language is restrictive, and "plainly limit[s] the release to the investigation, discipline, and process of the 2019 disciplinary action." He likewise maintains that the union grievance alleging racial discrimination pertained solely to the circumstances of the 2019 disciplinary matter, and thus serves as no obstacle to pursuing discrimination claims unrelated to the 2019 disciplinary matter.

We find these arguments unpersuasive. Middleton's claim, raised in his grievance, that the severity of the discipline was discriminatory is clearly a claim "arising from . . . the investigation, discipline, or process related to the disciplinary matter." Middleton contends that the waiver extends no further. But the Discipline Resolution Agreement also waives claims that "could have arisen from . . . the investigation, discipline, or process related to the disciplinary matter." At a minimum, attributing some distinct meaning to each of those terms—"arising from" and "could have arisen from"—means that the waiver must apply to more than the discrimination claims directly addressed in the disciplinary process. Middleton's reading of the Agreement is irreconcilable with these expansive terms.

We conclude that the Disciplinary Resolution Agreement waives Middleton's claims of past racial discrimination because such claims "could have arisen from, the investigation,

discipline, or process related to the disciplinary matter." As discussed above, Middleton filed a union grievance in response to the disciplinary matter, in which he claimed racial discrimination. The process of resolving that grievance would presumably have uncovered claims of past racial discrimination. In other words, such claims "could have arisen," or "result[ed]," from the "investigation, discipline, or process related to the disciplinary matter." *See* ARISE, Black's Law Dictionary (11th ed. 2019) (defining "arise" to include "[t]o result (from)").

We thus conclude that the Settlement Agreement's "ordinary meaning" releases Middleton's racial-discrimination claims against the LPD and Weathers based on events preceding the Agreement. *See Mostert v. Mostert Grp.*, LLC, 606 S.W.3d 87, 91 (Ky. 2020) (quoting *N. Fork Collieries, LLC v. Hall*, S.W.3d 98, 105 (Ky. 2010)) (holding that courts must "give effect to the parties' intent as expressed by the ordinary meaning of the language they employed"); *Smithfield Farms, LLC v. Riverside Devs., LLC*, 566 S.W.3d 566, 570 (Ky. Ct. App. 2018) (internal citations omitted) (noting that when a contract is "clear and unambiguous," the agreement must be given effect as written).

Our conclusion is supported by the Kentucky Supreme Court's broad interpretation of similar contractual language in the context of settlement agreements. The facts of *3D Enterprises Contracting Corp. v. Louisville & Jefferson County Metro Sewer District*, 174 S.W.3d 440 (Ky. 2005), are instructive. In that case, the sewer district entered into an agreement with a general contractor to build two "bioroughing towers." After one of the towers collapsed, the sewer district sued the general contractor for damages caused by the collapse. The parties eventually reached a settlement agreement whereby the sewer district released all of its claims with prejudice. In subsequent litigation between the parties, the sewer district argued that it was entitled to retain certain funds from the contract because the general contractor breached the original agreement

concerning the bioroughing towers. But the general contractor argued that the settlement agreement barred the sewer district from raising this breach-of-contract claim.

The Kentucky Supreme Court agreed with the general contractor. According to the Court, the sewer district's breach-of-contract claim was released when the sewer district agreed to waive "all possible, potential, or actual claims . . . both known and unknown, in contract or tort" against the contractor. *Id.* at 444–45. The Court further observed that "[t]he language of th[e] release is exceedingly broad." *Id.* at 448. This language included "any liability of any kind, character, or description whatsoever which does or may result from any factual or legal assertion that arises or might arise from the Lawsuit." *Id.* at 449 (emphasis omitted).

In the present case, the Settlement Agreement contains similar language to the one in *3D Enterprises*. The Agreement also contains a "release [that] is exceedingly broad." *See id.* at 448. Middleton waived any claim of any nature that "could have arisen from" the first investigation, in the same way that the sewer district in *3D Enterprises* waived all possible, potential, or actual claims "that arise[] or might arise" from the tower collapse. *Id.* at 448–49. Given (1) the similarity in waiver language that the Kentucky Supreme Court interpreted as broad, and (2) the accompanying release of the union grievance's racial-discrimination allegations, we agree with the district court that the Settlement Agreement bars Middleton's racial-discrimination claims against the LPD or Weathers based on events that predated the Settlement Agreement.

C.      **Middleton's hostile-work-environment claim is precluded because the claim relies entirely on events predating the 2019 Settlement Agreement**

Middleton next asserts that the district court erred in granting summary judgment on his hostile-work-environment claim. Because the 2019 Settlement Agreement bars consideration of Middleton's racial-discrimination claims predicated on events preceding the Agreement, he would

have to rely on circumstances postdating the Agreement in order to move forward with his hostile-work-environment claim. Middleton, however, conceded at oral argument that this claim is based only on those earlier events. Accordingly, the district court did not err in granting summary judgment on Middleton's hostile-work-environment claim.

**D.     The district court correctly granted summary judgment in favor of the LPD
and Weathers on Middleton's disparate-treatment claim**

Middleton also contends that the district court erred in granting summary judgment on his disparate-treatment claim. He can prove disparate treatment through either direct or indirect evidence. *See Tennial v. United Parcel Serv.*, 840 F.3d 292, 303 (6th Cir. 2016). Middleton bases his claim on indirect evidence, so "we analyze the claim under the *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792 (1973)] burden-shifting approach." *Clay v. United Parcel Serv.*, 501 F.3d 695, 703 (6th Cir. 2007).

"First, the plaintiff must make a prima facie case of racial discrimination." *Id.* This showing requires "that (1) he was a member of a protected class; (2) that he suffered an adverse employment action; (3) that he was qualified for the position; and (4) that a person outside the protected class was treated more favorably than him." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001). "Once the plaintiff establishes this prima facie case, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2005) (emphasis omitted). If the defendant meets this burden, then "the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination." *Id.* at 391–92.

The only element of Middleton's prima facie showing at issue in this appeal is the fourth requirement: whether a person outside of Middleton's protected class was treated more favorably than him. In *Mitchell v. Toledo Hospital*, 964 F.2d 577 (6th Cir. 1992), this court outlined three factors relevant in determining whether employees are "similarly situated" for the purposes of this analysis. To show that two individuals are similarly situated, the plaintiff "must have dealt with the same supervisor, have been subject to the same standards[,] and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* at 583.

But the nonprotected employee "need not be identical in every way in order to be a proper comparator." *Tennial*, 840 F.3d at 304. "Instead, the plaintiff must show that the comparator is similarly situated in all relevant aspects and has engaged in acts of comparable seriousness." *Id.* We must make an "independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee" based on the facts of the case before us. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998).

The district court rejected the following six individuals as comparators because they were found to have been the subject of only one disciplinary infraction: Brent Bereznak, Zachary Ridener, Jason Rothermund, Monica Rozalski, Roman Sorrell, and Jeremiah Terry. And the court rejected Hunter Faulconer, Adam Ray, and Kendall Turner as comparators because Chief Weathers was not the ultimate decisionmaker in their disciplinary actions. Finally, the court concluded that Joe Williams was an inapt comparator because of key differences in how he and Middleton disseminated officer information. Because Middleton continues to argue that these individuals are similarly situated to himself, we will now turn to these proposed comparators.

### 1. Middleton's disciplinary history is more severe than six of the proposed comparators who were disciplined only once

This court has held that "[d]ifferences in experience and disciplinary history" can establish that two employees are not similarly situated. *Tennial*, 840 F.3d at 304. In the present case, Middleton was disciplined twice, whereas Bereznak, Ridener, Rothermund, Rozalski, and Sorrell were the subject of only one disciplinary action. The subject of the disciplinary matters for the first five included inappropriate name calling, disclosing information about a citizen, disseminating photographs of the LPD database, and placing a tracking device on another officer's vehicle.

Terry, however, was accused of more severe misconduct: sexual misconduct and stalking. He was subsequently suspended for six months. Although this infraction was certainly egregious, it was still Terry's first offense. And Middleton does not offer evidence of subsequent misconduct where Terry was treated more favorably. *See Berry v. City of Pontiac*, 269 F. App'x 545, 550 (6th Cir. 2008) (concluding that the difference in the number of infractions between a plaintiff and comparator is an important variable in a disciplinary scheme). When considering that Middleton was the subject of two infractions and taking into account the nature of his second disciplinary proceeding, we conclude that no reasonable juror would find that Middleton was similarly situated to any of these six White comparators. *See Campbell v. Hamilton County*, 23 F. App'x 318, 325 (6th Cir. 2001) (noting that "differences in . . . disciplinary history may establish that two employees are not similarly situated").

### 2. Faulconer, Ray, and Turner were disciplined by different supervisors

Middleton also argues that the district court erred in its "same supervisor inquiry." Citing this court's decision in *McMillan v. Castro*, 405 F.3d 405 (6th Cir. 2005), he argues that the inquiry

"does not automatically apply in every employment discrimination case." *Id.* at 414. True enough. But the *McMillan* court counseled against a bright-line approach in that case because the record indicated that "the issue of whether [the plaintiff] and [the comparator] dealt with the same supervisor was relatively insignificant to the case." *Id.* The court found that issue insignificant where "there [was] no indication that the [employer] ever argued that [the plaintiff and the comparator] were not similarly situated because they did not deal with the same supervisor." *Id.* at 414–15. That is not the situation here because both parties contest the importance of whether Chief Weathers was the ultimate decisionmaker.

As the district court found—and Middleton does not contest—Weathers was not the ultimate decisionmaker for the discipline handed down to Faulconer, Ray, and Turner. "This court has previously held that a plaintiff and a comparable employee are not similarly situated where they were disciplined by different ultimate decision-makers." *Baker v. Noble Metal Processing, Inc.*, 276 F. App'x 477, 481 (6th Cir. 2008) (citing *Smith v. Leggett Wire Co.*, 220 F.3d 752, 762–63 (6th Cir. 2000)). Those individuals are therefore improper comparators because they were "disciplined by a different decisionmaker" than was Middleton. *See Leggett Wire Co.*, 220 F.3d at 762–63.

### 3. *Joe Williams's second disciplinary action was not of comparable seriousness to Middleton's second disciplinary action*

Middleton focuses on Joe Williams as a proper comparator because Williams, like Middleton, was disciplined twice. And Chief Weathers was the decisionmaker for both of them with regard to their second disciplinary action.

Williams's first disciplinary action, in 2017, concerned using LPD resources to monitor an ex-girlfriend's whereabouts and filming her having intercourse with a Black officer, as well as

spreading rumors about his fellow officers. He was not disciplined for these actions. And in 2022, Williams circulated a meme portraying a female officer holding a phallic symbol. He received only a one-day suspension for circulating that meme.

Even assuming that Middleton's first disciplinary action is of equal seriousness to Williams's, Middleton's second disciplinary action renders Williams an improper comparator. By disseminating confidential officer information and encouraging his cousin to confront the undercover officers, Middleton's actions risked officer safety and undermined the LPD's operations. Although Williams's meme was certainly offensive, it did not carry the same degree of seriousness or danger that Middleton's actions did. *See Tennial*, 840 F.3d at 305 (finding a comparator not similarly situated because the comparator did not "engage[] in acts of comparable seriousness"). Because of these differences, no reasonable juror would find Middleton and Williams to be similarly situated.

### 4. *Middleton's mixed-motive argument*

Middleton belatedly contends that the district court failed to conduct a mixed-motive analysis with regard to his disparate-treatment claim. But he raises this argument for the first time on appeal. We therefore decline to consider it. *See Mich. Bell Tel. Co. v. Strand*, 305 F.3d 580, 590 (6th Cir. 2002) ("This court does not ordinarily address new arguments for the first time on appeal.").

In sum, none of the comparators proposed by Middleton are similarly situated to him, and his mixed-motive argument comes too late. Accordingly, the district court did not err in granting summary judgment in favor of the LPD and Weathers on Middleton's disparate-treatment claim.

**E.      The district court correctly granted summary judgment against Middleton on his First Amendment claim**

We finally turn to Middleton's First Amendment retaliation claim against Chief Weathers. Middleton argues that Weathers retaliated against him for attending a protest, supporting police accountability, and backing racial equality on social media.

First Amendment retaliation claims are analyzed under a burden-shifting framework. *Dye v. Off. of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012). To succeed on such a claim, a plaintiff must show that:

> (1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct.

*Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006).

If a plaintiff establishes a prima facie case, "the burden then shifts to the [defendant] to demonstrate by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct." *Dye*, 702 F.3d at 294 (internal citation and quotation marks omitted). "Once this shift occurs, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 208 (6th Cir. 2010).

This court applies "a two-part inquiry for discerning when the discharge of a public employee violates the First Amendment." *Scarbrough*, 470 F.3d at 255. The threshold question is whether the employee's "speech may be fairly characterized as constituting speech on a matter of public concern." *Dambrot v. Cent. Michi. Univ.*, 55 F.3d 1177, 1186 (6th Cir. 1995) (internal citation and quotation marks omitted). "If the speech relates to a matter of public concern, then the court employs the balancing test outlined in *Pickering v. Board of Education*, 391 U.S. 563

(1968), to determine if the employee's free speech interests outweigh the efficiency interests of the government as an employer." *Rose v. Stephens*, 291 F.3d 917, 920 (6th Cir. 2002).

The district court found in favor of Weathers on the basis of qualified immunity, holding that Middleton had no clearly established right to share confidential police information. We agree. Moreover, even assuming that Middleton's dissemination of confidential LPD messages and tactics constituted a matter of public concern, we conclude that his claim would still fail because his "speech" was clearly on the short end of the *Pickering* balancing test.

Although "public employer[s] need not show actual disruption of the public agency in all cases" to prevail under the *Pickering* test, *Gillis v. Miller*, 845 F.3d 677, 687 (6th Cir. 2017), the record here shows the obvious disruptions that Middleton caused. Middleton disseminated confidential information to his cousin Sarah Williams that detailed LPD officers' locations and planned response to the ongoing protests. He likewise encouraged Williams to confront the officers. Weathers testified that Middleton's leaks about the LPD's planned response to the protests undermined the department's operations because the LPD was forced to make tactical adjustments and risk officer safety. He also explained that Middleton's dissemination disrupted the trust and harmony existing among LPD officers. And Weathers maintains that if he had not recommended Middleton's termination, then the remaining officers would have viewed his inaction as an endorsement that they were free to attack one another, which would have impaired future discipline.

Had Middleton simply posted his support for racial equality on social media or joined the ongoing marches to protest the racial abuse that he endured at the LPD, his retaliation argument would have more merit. But considering the leaks of confidential information and associated operational harms discussed above, we are unpersuaded by Middleton's argument. Weathers was

not required to "tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships." *See Connick v. Myers*, 461 U.S. 138, 154 (1983). Accordingly, the district court did not err in granting summary judgment on Middleton's First Amendment claim.

**F.      Middleton's remaining claims are waived**

Middleton's amended complaint raises breach-of-contract, state-law workplace-retaliation, and disparate-impact claims. On appeal, however, he makes no references to these claims. Middleton has therefore waived these claims. *See United States v. Thornton*, 609 F.3d 373, 380 (6th Cir. 2010) ("Issues raised in the district court, but not on appeal, are considered abandoned and not reviewable on appeal.").

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

**COLE, Circuit Judge, concurring in part and dissenting in part.** I agree that the panel should affirm the district court's grant of summary judgment to the LPD as to Middleton's hostile work environment, disparate impact, breach of contract, state workplace retaliation, and First Amendment retaliation claims. I depart, however, from the majority as to Middleton's disparate treatment claim and write separately for two reasons.

First, this employment dispute arose within an LPD workplace that was rampant with unchecked racial discrimination. As the record shows, Middleton's termination is inextricably intertwined with the police accountability movements of 2020, which protested ongoing racial discrimination by law enforcement against Black people. Second, the district court erred in granting summary judgment on Middleton's disparate treatment claim. A reasonable jury could find that LPD Officer Joe Williams was similarly situated to Middleton and that the LPD's proffered reasons for Middleton's termination were pretextual. Because I believe we should reverse the district court's grant of summary judgment in favor of the LPD as to Middleton's disparate treatment claim, I respectfully dissent.

I.

A.

I begin by recognizing the role of racial discrimination in this case. Middleton's termination stems from his actions during the police accountability movement in the summer of 2020. The purpose of this movement was to highlight the high rates of violence and discrimination by police officers against Black people, whether those people were members of law enforcement or not. Therefore, Middleton's status as a Black officer within the LPD during this time period remains at the forefront of my analysis of his disparate treatment claim.

B.

The district court erred in granting summary judgment for the LPD on Middleton's disparate treatment claim. First, Middleton must make a prima facia case that he: (1) "was a member of a protected class;" (2) "suffered an adverse employment action;" and (3) "was qualified for the position;" and (4) that a similarly situated "person outside the protected class was treated more favorably than he." *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 703 (6th Cir. 2007) (quoting *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001)). The parties do not dispute that Middleton meets the first three elements. Whether his disparate treatment claim survives summary judgment turns on whether he can show a genuine dispute of material fact as to the "similarly situated" prong.

A similarly situated employee must "have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Commonwealth v. Solly,* 253 S.W.3d 537, 542 (Ky. 2008) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). This court considers, among other relevant factors, "whether the employees: (1) engaged in the same conduct, (2) dealt with the same supervisor, and (3) were subject to the same standards." *Johnson v. Ohio Dep't of Pub. Safety*, 942 F.3d 329, 331 (6th Cir. 2019) (citing *Mitchell*, 964 F.2d at 583). Each panel, however, "should make an independent determination" as to "the plaintiff's employment status" because "[t]he plaintiff need not demonstrate an exact correlation"—just that they are similar "in all of the *relevant* aspects." *Redlin v. Grosse Point Pub. Sch. Sys.*, 921 F. 3d 599, 610 (6th Cir. 2019) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)).

The majority concludes that Middleton's claim fails because he cannot show that similarly situated officers outside his protected class were treated more favorably than he. I disagree because

Williams is an appropriate comparator. In 2017, Williams stalked an ex-girlfriend (who was also a LPD officer), used agency resources to monitor her whereabouts, twice confronted her at her home when there were other individuals in the house, and threatened to distribute a video he claimed to have filmed of her having sexual intercourse with a different officer to extort money from her. The second time Williams confronted the female officer at her home, he blocked her then-boyfriend from leaving the garage, yelled that he had seen them having sexual intercourse, and collapsed on the floor uncontrollably crying. Williams later called the female officer and sent her multiple texts telling her she was disgusting, and he attempted to extort her by demanding $900 and stating that, "for once in your life you are going to pay for what you did to me." (J. Williams Investigation, R. 73-34, PageID 5058.) When the female officer later became pregnant, Williams spread rumors that she had sexual intercourse with multiple officers, any of whom could be the child's father.

Williams continued this harassment for more than six months. The female officer eventually filed for a protective order against Williams. The LPD Public Integrity Unit (PIU) investigated, but no disciplinary actions were taken because the situation was deemed "a personal relationship between two employees" and the result of "hard feelings and personal, non-work-related behaviors." (*Id*. at PageID 5067.) A year later, in June 2018, another investigation was launched against Williams and two other officers for spreading the same rumors that the female officer had sexual intercourse with multiple officers while on duty. The investigation was dismissed because the LPD concluded that the issue was already addressed the prior year.

In December 2021, Williams circulated a meme created by another male officer with a photoshopped image of a different female officer holding a phallic symbol. Williams received only a one-day suspension. The female officer had received the "Crimes Victims Rights Award"

for her work with sexual assault survivors, and a picture of her holding the award at the ceremony was edited to replace the award with the phallic symbol. Shortly after seeing the meme, Williams then sent it to the female officer because he thought it was funny, but later admitted to feeling bad because she was greatly disturbed by the meme. Initially, only the two officers who created and first distributed the meme were disciplined, but the investigation uncovered enough evidence for Williams to be disciplined too.

The majority correctly concludes that Middleton was subjected to the same LPD standards as Williams—who also had multiple, separate disciplinary incidents—and that Chief Weathers was the final decision-maker for both of their final investigations. The only remaining factor to consider is whether Middleton and Williams engaged in the "same conduct." The majority concludes, however, that Williams's second disciplinary action renders him an inappropriate comparator because the circulation of the meme was not of equal seriousness to Middleton's dissemination of confidential police information to Sarah Williams in 2020. Respectfully, I disagree with their conclusion and their framing of the issue.

As a threshold matter, Williams's second disciplinary action cannot be viewed in isolation. The LPD has a progressive disciplinary system designed to increase the severity of discipline for each infraction committed. Under a progressive disciplinary system, appropriate discipline for subsequent infractions should take into account prior discipline and the severity of the charged conduct in each instance. *See also Berry v. City of Pontiac*, 269 F. App'x 545, 549–50 (6th Cir. 2008) (concluding that the plaintiff's disciplinary history was integral to determining the severity of discipline imposed under a progressive disciplinary scheme). Therefore, the LPD looks at an

employee's entire personnel record when making disciplinary decisions.[1]  Just as Chief Weathers considered Middleton's history of misconduct when recommending termination, the full history of Williams' misconduct at LPD must also be considered to determine whether he is an appropriate comparator.

Under this framework, when analyzing the "same conduct" factor, we must determine whether the course of Williams's conduct was of "comparable seriousness" to the course of conduct that led to Middleton's termination and would result in similar harm.  *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 778–83 (6th Cir. 2016) (finding conduct of comparable seriousness where plaintiff and other medical professional comparators, despite taking different actions, put patients in danger resulting in major infractions).  The seriousness inquiry often turns on the nature of the misconduct and the harm or potential harm posed.  *See, e.g., Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002) (finding three white male coworkers who "pulled a rig away from a loading dock without insuring that the back doors were closed and that the dock plate had been removed" were not similarly situated to a Black male plaintiff who did the same but injured a coworker, causing her permanent disability); *Colvin v. Veterans Admin. Med. Ctr.*, 390 F. App'x 454, 459 (6th Cir. 2010) (finding plaintiff pharmacist who erroneously dispensed prescription medication was not similarly situated to pharmacist comparator who failed to complete prescription paperwork, because the "safety and legal risks" associated with both were different).  While the facts need not be identical, we must determine whether any factual differences are relevant to the dispute.  *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir.

---

[1] For example, the recommended discipline for disparaging other officers is a reprimand for the first offense, a one-day suspension for the second, and a three-day suspension for the third. (Police Disciplinary Proc., R. 73-10, PageID 4682.)  The recommended discipline for misuse of department resources is a three-week suspension for the first offense, three-month suspension for the second, and termination for the third. (*Id.* at PageID 4684.) The recommended discipline for dissemination of police information is a one-month suspension for the first offense, a six-month suspension for the second, and termination for the third. (*Id.*)

2006) (finding plaintiff and comparator were not "similarly situated . . . because they engaged in different conduct, and the differences in their conduct [were] relevant."); *see also Jackson*, 814 F.3d at 782 (explaining that plaintiff and comparator are not required to "commit exactly the same mistake in order to permit a reasonable inference of intentional discrimination from their differential discipline.").

In this case, Middleton and Williams caused harm of comparable seriousness to their coworkers and to the LPD. Middleton violated LPD policies on dissemination of information, disparagement of other officers, and misuse of department resources. The same is true for Williams who spread disparaging and personal rumors about his ex-girlfriend (an LPD officer), monitored her whereabouts, showed up uninvited to her home, and threatened to distribute a video that he claimed he filmed of her having sexual intercourse with another person. Additionally, he sent the 2021 phallic meme to the female officer who was the subject of the meme, which launched an extensive investigation, caused her great personal distress, and resulted in unfounded rumors spreading to other officers.

Middleton's misconduct unquestionably extended beyond the realm of sexual harassment. But to conclude that Middleton's 2020 Facebook messages undermined the integrity of LPD's functioning, but not also conclude that Williams's history of sexual harassment had the same—or worse—effect ignores the pervasive impact of workplace sexual harassment. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (quoting *Henson v. Dundee*, 682 F.2d 897, 902 (11th Cir. 1982)) ("Sexual harassment which creates a hostile or offensive environment for members of one sex is every bit the arbitrary barrier to sexual equality at the workplace that racial harassment is to racial equality."). That Williams's conduct arose entirely from personal relationships and disputes is irrelevant. Not only were the direct targets of Williams's harassment co-workers, but other LPD

officers were impacted by the spread of rumors, the circulation of the meme, and the toxic environment Williams created. Further, the danger of technology and social media is that images like the meme can be distributed widely and without end. *See, e.g., United States v. Libbey-Tipton*, 948 F.3d 694, 708 (6th Cir. 2020) ("[D]istributing child pornography through computers is particularly harmful because it can reach an almost limitless audience.") (citation omitted)

The LPD justifies Middleton's termination by arguing that his repeated misconduct degraded trust and harmony within the department and impacted the integrity of the LPD's operations. While Williams's actions might not have resulted in the dissemination of the LPD's operational plans, a reasonable jury could conclude that he caused the same degradation of harmony and trust within the department. Other officers may harbor the same strong feelings of dislike and distrust toward an officer who engaged in repeated sexual harassment and misconduct as an officer who disseminated the operational information that Middleton did here. Both officers' conduct could affect safety and cohesiveness in the unit, and the differences among them do not render Middleton so facially distinguishable from his comparators "as to obviate the need for [LPD] to provide an explanation for its differential treatment." *Jackson*, 814 F.3d at 778; *see also Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 813 (6th Cir. 2011) ("One common misapplication [of the *McDonnell Douglas* framework] is the tendency to push all of the evidence into the prima facie stage and ignore the purpose for and application of the three stages.").

While it is reasonable that the LPD would seek a more severe punishment for a second disciplinary action, its disciplinary approach is inconsistent at best. Williams arguably committed three separate acts of misconduct, the first of which involved repeated harassment over the course of six months, and the second of which involved circulation of the same rumors the following year. While his third and final infraction—dissemination of the meme to the subject of the image—

appears less severe in comparison, it demonstrates that he failed to learn from his prior offenses. The larger context of Williams' disciplinary history is easily lost because the LPD imposed no discipline at all for his egregious conduct in 2017 and 2018.

Therefore, the relevant facts—the LPD policies that were violated, and the deterioration of trust within the LPD as a result of Middleton's and Williams's respective actions—are "similar in kind and in severity." *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 309 (6th Cir. 2016). Looking at their histories of misconduct and construing the facts in Middleton's favor, a reasonable jury could conclude that there are no "differentiating or mitigating circumstances that would distinguish their conduct or [LPD's] treatment of them for it." *Ercegovich*, 154 F.3d at 352 (quoting *Mitchell*, 964 F.2d at 583). Instead, the consequences of their actions resulted in harm of comparable seriousness to LPD officers and the department overall.

## C.

Finding that Middleton fails to plead a prima facie claim for disparate treatment, the majority does not continue its analysis. The district court concluded, however, that even if Middleton were able to make a prima facie showing, he failed to demonstrate that the LPD's legitimate, non-discriminatory reason for his termination was pretext for a more sinister motive.

The LPD articulates a "legitimate non-discriminatory reason" for Middleton's termination. *Braithwaite*, 258 F.3d at 493 (citation omitted). Middleton disseminated confidential information, publicly disparaged other officers, violated several internal guidelines, and had a history of prior infractions. Further, the reasons for the decision are "clear and reasonably specific" and supported by "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 258 (1981).

Middleton is afforded an opportunity, however, to demonstrate that the employer's proffered reason is pretextual. *Clay*, 501 F.3d at 704. He must demonstrate that the proffered reason: "(1) has no basis in fact, (2) did not actually motivate" the department's decision to terminate, or (3) was "insufficient to warrant" termination. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). The Sixth Circuit follows the "modified honest-belief" rule, which avoids a finding of pretext where the employer can "establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Wright*, 455 F.3d at 708 (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)). Even where the stated reason for discipline is reasonable, the court must not "blindly assume that an employer's description of its reasons is honest." *Smith*, 155 F.3d at 807.

At this stage, Middleton must demonstrate that the conduct was "substantially identical," and that the proffered explanation can only be explained as pretext. *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 893 (6th Cir. 2020); *see also Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 286–87 (6th Cir. 2012) (declining to find pretext where proposed comparator's data inputting mistakes resulted in vendor checks being returned to the employer while plaintiff's data inputting mistakes resulted in double payments to vendors). A plaintiff is not always required to introduce new evidence of discrimination beyond that supporting the prima facie case. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000). The evidence already presented is sufficient if it "specifically rebut[s] the employer's proffered legitimate, nondiscriminatory reason" for termination. *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 85 (6th Cir. 2020). For this reason, the "substantially identical" language is not read to increase the burden of proof but indicates "a change in the rigor with which we evaluate" Middleton's similarities to Williams. *Jackson*, 814 F.3d at 780. When conducting this rigorous comparison, we focus on "the severity of the

differently treated employees' actions" and consider "both the actual and potential consequences of the employee's actions." *Id.*

Middleton's argument hinges on whether he can demonstrate that the LPD's reason was insufficient to warrant termination. This generally consists of evidence that the employer did not take adverse employment actions against employees outside of the protected class, "even though they engaged in substantially similar conduct to that which the employer contends motivated" the adverse employment action. *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003) (citation omitted). Again, the LPD rests its termination decision on Middleton's history of disparaging other officers, disseminating confidential information, misusing department resources, and sowing distrust among LPD officers. But Williams was not terminated, despite violating substantially identical policies and causing similarly pervasive uproar in the department. The actions of both individuals had actual consequences for other LPD officers, and, in Williams's case, exposed LPD to legal liability for sexual harassment claims. *See Clark v. United Parcel Servs., Inc.*, 400 F.3d 341, 348 (6th Cir. 2005) (explaining that an employer is liable for employment sexual harassment if it "knew or should have known" of the conduct and failed to address it).

More squarely at issue here, the facts illustrate that Middleton was ostracized for his support of the police accountability movement in the wake of George Floyd's murder—one that is inherently connected to the systemic racial discrimination within the LPD. Specifically, Middleton's status as a Black man, combined with his participation in the police accountability movement, cannot reasonably be separated from the disciplinary actions taken against him. Middleton was the only officer terminated in recent history, despite—as outlined by the majority— other severe misconduct committed by LPD officers relating to sexual harassment and racial discrimination. Although a reasonable jury could also conclude that his termination was not

motivated by his support of the police accountability movement, that same jury could reasonably conclude the opposite. Therefore, we cannot ignore that his termination was intimately connected to his criticisms of the LPD and law enforcement nationwide.

Indeed, the same sort of racial bias within police departments that colored the discourse surrounding the police accountability movement—and that prompted Middleton to protest here—was likewise rampant within the LPD. To reiterate here briefly, Middleton details multiple instances of racial animus targeted at him specifically during his tenure at the LPD. His garage door was graffitied with a racist threat, memes depicting him stalking scared white women were circulated throughout LPD, he was referred to as the "token [Black] boy," he was told to "turn [his] Black ass face around" by another officer in front of other LPD officers, reminded that he was the only "Black person in here" and that "nobody want[ed] [him]" at an FOP meeting, white officers openly used the word "ni**a" in front of him, and he was passed up for promotions. (Middleton Dep., R. 54-7, PageID 2064–65, 60:20–63:17; 2070, 83:7–85:8; 2071, 86:23–87:3; 2072, 91:12–92:8; 2074–75, 101:10–103:16; 2076, 107:9–18; 2080, 122:11–24; 2086, 148:20–149:23; 2121, 286:22–288:13.) But evidence of racist actions by LPD officers are not limited to those Middleton experienced. As detailed by the majority, Middleton alleges that numerous civilian complaints alleging racial discrimination were filed against other officers for using racial epithets during both verbal and physical altercations.

These examples show that racial bias undoubtedly plagued Middleton's experience as a law enforcement officer. It is also evidence that challenges the reasonableness of the LPD's decision given its own history of imposing little to no discipline on other officers for impacting department operations with misconduct of comparable seriousness.

For the reasons above, a jury could conclude that the difference in treatment reveals the unreasonableness of Middleton's termination, that the LPD's proffered reason for termination was not reasonably "honestly held," and that the department engaged in racial discrimination. *Smith*, 155 F.3d at 807–08. Admittedly, this claim may present a close call, but close calls are the province of a jury, not this court.

III.

Because I would reverse the district court's grant of summary judgment to the LPD on Middleton's disparate treatment claim, I respectfully dissent in part.